CATHERINE KOLB, Admx., *vs.* UNION RAILROAD COMPANY.

PROVIDENCE—JUNE 3, 1901.

PRESENT : Stiness, C. J., Tillinghast and Rogers, JJ.

(1) *New Trial. Negligence. Evidence. Impeaching Witness.*

In an action for negligence under Gen. Laws cap. 233, § 14, brought by a widow for the benefit of herself and the children of the deceased, evidence that plaintiff had given birth to an illegitimate child after the death of her husband is inadmissible as affecting plaintiff's character for veracity.

(2) *Evidence. Impeaching Witness.*

The credit of a witness can be impeached only by showing that his general reputation for truth and veracity is bad, and, except in that class of cases where the act inquired about has some relation to or bearing upon the issue involved, specific acts of misconduct cannot be shown.

(3) *New Trial.*

Where evidence improperly admitted was of such a character as to be likely to prejudice the jury against the plaintiff, and it is not clear from the evidence that the defendant was entitled to a verdict in any event, a new trial will be granted.

TRESPASS ON THE CASE for negligence.  The facts are stated in the opinion.  Heard on petition of plaintiff for new trial, and new trial granted.

TILLINGHAST, J.  One of the grounds relied on by the plaintiff in her petition for a new trial in this case is that the justice presiding at the jury trial thereof erred in the admission of certain testimony.  The action was brought by the plaintiff, who is the widow of Gottlieb Kolb, for the benefit of herself and her three minor children by said Gottlieb living at the time of his decease, and all of whom were living when this action was begun, which was nearly two years after his decease.

The declaration alleges that the action was brought for the benefit of the plaintiff administratrix, as widow of the deceased, and also for the benefit of John Kolb, George Kolb, and Julia Kolb, all surviving minor children of said Gottlieb Kolb, deceased, living at the time of his decease and now still surviving.

At the trial of the case the plaintiff was called as a witness for the purpose, amongst other things, of proving her marriage, her qualification as administratrix, and who, as beneficiaries in this action, under the statute, were entitled to the damages, if any, which should be recovered for the death of her husband.

Upon her examination in chief she was asked about the members of her family at the date of her husband's death, January 3, 1894, and also at the date of the commencement of this action, December 30, 1895, which was nearly two years after his decease. The questions asked, in so far as they are pertinent to the present inquiry, were these : " Q. At the time of your husband's death and at the time you began this suit, how many children had you by Gottlieb Kolb? A. Three children. Q. That are living? A. Yes, sir. Q. How many children did you have by Gottlieb Kolb? A. Three." Then follows testimony giving the names of these children as set forth in the declaration, and the age of each. " Q. Did you ever have any other children by Gottlieb Kolb? A. No, sir." In cross-examination counsel for defendant was permitted, against the objection of the plaintiff and after some discussion as to the evident purpose of the inquiry, to ask the following question : " Q. You have more than three, haven't you ? " The court ruled that it would be proper for the defendant to show what children the deceased left, and, as affecting the plaintiff's character for truth and veracity, to show that there had been improper conduct on her part since her husband's death.

(1) The ground of objection on the part of plaintiff was that the evidence was immaterial and irrelevant, and was specially obnoxious to the objection that it was an attempt to impeach the plaintiff's character for chastity without first showing a conviction of the offence involved in her misconduct. Notwithstanding the plaintiff's objection, however, she was compelled to admit that she gave birth to an illegitimate child October 20, 1895, more than twenty-one months after her husband's death. The admission of this evidence was duly excepted to by the plaintiff, and the question presented, there-

fore, is whether the court erred in admitting it. We think this question must be answered in the affirmative. Whether or not the plaintiff had given birth to a bastard child was entirely irrelevant to any issue involved in the case on trial. Nor do we understand it to be seriously contended by defend-ant that it was. But it is vigorously contended that it was competent for the defendant to prove the unchastity of the plaintiff, for the purpose of affecting her credibility as a wit-ness in the case.

The broad claim advanced by counsel for defendant, in sup-port of the ruling complained of, is that a witness may be interrogated upon cross-examination in regard to any vicious or criminal act of his life, and may be compelled to answer unless he claims his constitutional privilege. We think this position is clearly untenable ; and that, while it finds support in some of the cases relied on by the defendant, the contrary view is overwhelmingly sustained by the authorities.

We agree that specific acts of misconduct committed by a party to the suit may be shown in that class of cases where the act has some relation to or some bearing upon the issue involved in the case, and also that the general reputation of the party as to the particular trait of character involved may also be shown. Thus in *Mitchell* v. *Work*, 13 R. I. 645, which was an action to recover damages laid at $5,000 for an in-decent assault, it was held that testimony showing the plain-tiff to have been unchaste in her relations with men, and also testimony that her reputation for chastity was bad, was prop-erly admitted. The plaintiff in that case was suing for some-thing more than compensation for bodily injuries. Indeed, the *gravamen* of the assault consisted, according to her testi-mony, in the insult, the personal indignity, and in the men-tal suffering and sense of shame and wrong consequent upon it. It was therefore clearly pertinent for the defendant to show that she was a vulgar, licentious, and unchaste woman, and hence that the damages to which she would be entitled, if any, would be much less than if she had been upright and chaste in her character. But no such question is presented in the case at bar. Here the plaintiff is suing for damages sus-

(2) tained by the death of her husband through the alleged neg-
ligence of the defendant.  And the fact that she has given
birth to an illegitimate child since the death of her husband
in no way whatever affects the question of damages involved
in the case ; nor, indeed, does it affect any other question
involved therein.  Nor can said fact be properly shown for
the purpose of affecting the plaintiff's credibility for truth
and veracity.  The credit of a witness can be directly. im-
peached only by showing that his general reputation for
truth and veracity is bad.  " Certainly it is a fixed and estab-
lished rule of evidence,'? as said by the court in *Holbrook* v.
*Dow,* 12 Gray, 358, "that it is not competent, for the pur-
pose of creating a distrust of his integrity and of thus dis-
paraging his testimony, to prove particular acts of alleged
misbehavior and dishonesty in relation to matters foreign to
all the questions which are involved in the trial.  'This
point,' says Mr. Greenleaf, 'has heretofore been much the
subject of discussion, but it must now be considered as settled
and at rest.'"

In the latest edition of Greenleaf on Evidence, vol. 1,
§ 461 a, the rule as laid down by the present editor, relating
to the impeachment of a witness, is stated as follows : "The
fundamental trait desirable in a witness, is the disposition
to tell truth, and hence, the trait of character that should
naturally be shown, in impeaching him, is his bad character
for veracity.  But there has always been more or less sup-
port for the use of bad general character—*i. e.*, the man as a
whole, not specifically the trait of veracity—as necessarily
involving an impairment of veracity.  This was the original
English doctrine, but it was replaced in the early 1800s by
the first mentioned principle with the exception that the wit-
ness was allowed to base his statement as to the other's vera-
city upon his knowledge of the other's general character.  In
this country, the better doctrine that the trait of veracity
only could be considered was early introduced ; and this is the
rule in the great majority of jurisdictions."

In vol. 29 Am. & Eng. Ency. Law, pp. 804–6, the rule as
to the admissibility of particular acts of misconduct, and

also as to particular traits of character, is well stated in the following language : " Whether the inquiry into the character of the witness be confined to his reputation for truth and veracity or extend to his general moral character, the rule is uniform that evidence of specific crimes or of particular acts of misconduct on his part is not admissible for the purpose of impeaching his credit. The impeaching evidence must be confined to the general reputation of the witness. It is also a general rule that peculiar traits of character, aside from that of habitual lying, shall not be made the subject of inquiry for the purpose of impeaching a witness. Thus, a witness may not be impeached by evidence that he is in the habit of associating with lewd and unchaste women, neither is it permissible, as a rule, to impeach a female witness by attacking her reputation for chastity even where it is proposed to prove that she is a common prostitute." The author adds, however, that " in a few cases the wholesome restraints of this rule have been disregarded." The cases cited which are to this effect are from Missouri, Georgia, and Kentucky.

The general doctrine above announced is sustained by Wharton on the Law of Evidence, 3 ed. § 541 ; Rapalje on the Law of Witnesses, § 197 ; Thompson on Trials, §§ 524, 525 ; and is also in accord with the great majority of decisions throughout the country.

As specially pertinent to the particular question here involved, we cite the cases of *Com.* v. *Churchill,* 11 Met. 538 ; *State* v. *Smith,* 7 Vt. 141 ; *Spears* v. *Forrest,* 15 Vt. 437 ; *Gilchrist* v. *McKee,* 4 Watts, 380 ; *State* v. *Carson,* 66 Me. 116 ; *Rudsdill* v. *Slingerland,* 18 Minn. 380 ; *Atwood* v. *Impson,* 20 N. J. Eq. 157 ; *Bucklin* v. *State,* 20 Ohio, 18 ; *Muetze* v. *Tuteur,* 77 Wis. 243 ; *Dimick* v. *Downs,* 82 Ill. 570 ; *Moore* v. *Moore,* 73 Tex. 382.

That a trial court may properly exercise a large discretion in permitting matters which are not strictly relevant to the issue involved in the trial to be brought out in the cross-examination of witnesses, there can be no doubt. It is through cross-examination that the whole truth is generally brought out and that the motives of the witness in testifying

are made apparent. The power of cross-examination has been justly said to be one of the principal, as it certainly is one of the most efficacious, tests which the law has devised for the discovery of truth. 1 Greenlf. on Ev. 15 ed. § 446. If the witness is biased or prejudiced in favor of the party calling him, that may be made to appear in cross-examination. If he has previously made statements contrary to those made upon the witness-stand, this fact may be brought out in the same way. His relation to the case, if any, his interest in the result ; his relationship to the parties or to either of them ; how he came to be a witness ; his intelligence ; means of knowledge ; his business ; place of residence ; the accuracy of his memory ; and many other things which need not be enumerated may be thus brought out for the purpose of enabling the jury to rightly estimate and weigh his testimony. But that the past life of a witness may be ransacked and his misdeeds paraded before the jury for the purpose of disgracing and degrading him in their eyes is so obnoxious to our sense of what is justly due to a person on the witness-stand that we cannot consent thereto. If unrestricted liberty were allowed in this respect, no witness, however modest or however venerable, could be sworn without being required, if it should please the opposing counsel, to submit to an investigation into his or her past history, however offensive and humiliating this might be, and notwithstanding the fact that the particular acts of misconduct which might thus be brought out were long ago atoned for and generally forgotten. Such inquisitions the great majority of the courts refuse to permit, and, we think, rightly so refuse.

The previous rulings of this court, so far as we are aware, have always been in harmony with the position which we have thus taken.

An examination of the numerous cases cited in the well-prepared briefs of the respective counsel in this case conclusively shows that the authorities are hopelessly divided on the question at issue, and hence it would serve no useful purpose to further discuss their relative merits. We therefore content ourselves by adopting that view which most strongly

commends itself to our judgment, and which, as already said, is supported by the great preponderance of authority.

(3)    As the admission of the irrelevant and improper testimony referred to was of such a character as to be very likely to prejudice the jury against the plaintiff—indeed, in view of the record in the case, it is not too much to say that it *probably* had this effect—and as it is not clear from the evidence that the defendant was entitled to a verdict in any event, a new trial must be granted.   *Graham* v. *Coupe*, 9 R. I. 478 ; *King* v. *Colvin*, 11 R. I. 582 ; *Tourgee* v. *Rose*, 19 R. I. 432. We express no opinion as to the merits of the petition in so far as it is based on the ground that the verdict is against the evidence.

Petition for new trial granted, and case remitted to the Common Pleas Division:

*John W. Hogan* and *George R. Macleod*, for plaintiff.
*David S. Baker*, for defendant.