**328 A.2d 414.**

STATE *vs.* CLARENCE E. SPIVEY.

NOVEMBER 22, 1974.

PRESENT: Roberts, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

KELLEHER, J. The defendant is black. He stands convicted after a jury trial in the Superior Court of four charges, three of which relate to the assault with a dangerous weapon, the kidnap, and the rape, of a white female. The remaining charge concerns the assault of a male whose identity and connection with this case, at this point, are a mystery to us. In his appeal the defendant challenges the procedure involved in the selection of the jury and the severity of his sentences. The trial justice imposed consecutive sentences—35 years for the rape, 10 years for the kidnapping, and 5 years each on the assault charges. Since the transcript furnished to us is restricted to the voir dire conducted during the impaneling of the jury, we shall forego any discussion of the sentencing phase of this appeal without prejudice to the defendant's right to raise the issue in some other appropriate relief proceeding. Assuming the propriety of our reviewing a sentence imposed within the statutory limits by the trial court, the absence of any of the testimony relating to the episode unfolded before the jury makes this facet of the defendant's appeal an exercise in futility.

Rule 24(a) of the Superior Court Rules of Criminal Procedure vests discretion in the trial justice to either conduct the voir dire examination himself or allow the defendant or his attorney and the prosecutor to do so. If the court elects to interrogate the jurors, he must permit additional inquiry by the respective attorneys. The rule specifically states that the voir dire's purpose is to determine whether the prospective juror (1) is related to a party, (2) has any interest in the case, (3) has expressed

or formed an opinion, or (4) is "sensible of any bias or prejudice therein."

Here, each juror was first interrogated by the trial justice, then by the prosecutor and the defense counsel. The transcript shows that some 44 prospective jurors participated in the voir dire. Taking advantage of Rule 24(c) the trial justice impaneled a jury of 16 members all of whom but one[1] sat and heard the evidence, the arguments of counsel, and the charge. At the conclusion of the charge, the clerk placed the names of the 15 in a small barrel, closed and rotated the barrel, and then drew therefrom 12 names. The three whose names were not drawn were excused. One of the remaining 12 was designated as foreman. The jury then retired to commence its deliberations.

During the examination of the first potential juror, defense counsel posed the following question:

> "Do you think that black people are more sexually aggressive than white people?"

The question varied as it was asked again of some but not of all those who were interrogated. Sometimes the category was restricted to black males who were described as being either "more sexually aggressive" or having "sexual superiority" or "more sexual prowess" than their white counterparts. Each time the question was asked, the state's objection thereto was sustained.

When this inquiry was initially made, the trial justice remarked that he had never heard of the proposition that served as the basis of the interrogatory. However, the trial justice said that he would not bar the question in

---

[1]The clerk's minute book indicates the names of the 16 who were ultimately selected. The stenographer has furnished us with a supplemental transcript. It lists the 12 individuals who actually adjudicated the question of guilt or innocence. This transcript also shows that two days after the actual presentation of testimony began, one of the 16 was excused from further service.

all circumstances but he would extend counsel's latitude upon a showing, however tenuous, of some prejudice by any potential juror. The defendant now alleges that the trial justice's continuous refusal to allow a response to this type of question violated his constitutional right to a fair trial.

The issue raised here is highlighted against the background of two rulings made by the United States Supreme Court.

Over 40 years ago the Court reversed a conviction because of a trial justice's refusal to conduct a voir dire examination as to prospective jurors' racial prejudice in a case where a Negro was on trial for the murder of a white policeman. *Aldridge* v. *United States,* 283 U. S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931). There, Mr. Chief Justice Hughes, after relying on a line of state cases to find error, wrote:

> "The argument is advanced on behalf of the Government that it would be detrimental to the administration of the law in the courts of the United States to allow questions to jurors as to racial or religious prejudices. We think that it would be far more injurious to permit it to be thought that persons entertaining a disqualifying prejudice were allowed to serve as jurors and that inquiries designed to elicit the fact of disqualification were barred. No surer way could be devised to bring the processes of justice into disrepute." *Id.* at 314-15, 51 S.Ct. at 473, 75 L.Ed. at 1058.

There was and still is some uncertainty as to whether the holding in *Aldridge* was of constitutional magnitude or whether the pronouncement was an exercise of the Court's supervisory power over the federal judicial system.

Any doubts as to the thrust of the *Aldridge* rule could have been dispelled by the more recent case of *Ham* v. *South Carolina,* 409 U. S. 524, 93 S.Ct. 848, 35 L.Ed.2d

46 (1973). There, a black defendant well known in his community as a civil rights activist was convicted of possessing marijuana. The trial justice refused to ask the jurors four questions submitted by the defense—two of which dealt with possible racial prejudice. The Supreme Court reversed and stated, "we think that the Fourteenth Amendment required the judge *in this case* to interrogate the jurors upon the subject of racial prejudice * * * the essential fairness required by the Due Process Clause of the Fourteenth Amendment requires that *under the facts shown by this record* the petitioner be permitted to have the jurors interrogated on the issue of racial bias." (emphasis added) *Id.* at 527, 93 S.Ct. at 850, 35 L.Ed.2d at 50. The Massachusetts Supreme Judicial Court in holding that the *Ham* case did not set forth a new broad constitutional principle that automatically allows the questions of prospective jurors about their potential racial prejudices in all criminal trials where the defendant is black, limited the *Ham* rule to situations where there is reason to believe that the defendant may be a "special target for racial prejudice." *Commonwealth* v. *Ross,* Mass., 296 N.E. 2d 810, *cert. denied,* 414 U. S. 1080, 94 S.Ct. 599, 38 L.Ed.2d 486 (1973).[2] The Massachusetts view has found some favor. *United States* v. *Walker,* 491 F.2d 236 (9th Cir. 1974).

Support for the view that *Ham* affords a constitutional right for a voir dire in the area of racial prejudice can be found in the following passage of Mr. Justice Rehnquist's majority opinion, "The inquiry as to racial prejudice derives its constitutional stature from the firmly established precedent of *Aldridge* and the numerous state cases upon which it relied, and from a principal purpose as well as

---

[2]The Supreme Court denied certiorari despite a vigorous dissent by Justices Marshall, Douglas and Brennan, *Ross* v. *Massachusetts,* 414 U. S. 1080, 94 S.Ct. 599, 38 L.Ed.2d 486 (1973).

48

from the language of those who adopted the Fourteenth Amendment." *Ham* v. *South Carolina, supra* at 528, 93 S.Ct. at 851, 35 L.Ed.2d at 51. Refusal to make inquiry of jurors as to their possible bias arising from the fact that a defendant is a Negro, after a timely request, has been considered as an ipso facto violation of the due process clause. *United States* v. *Robinson,* 485 F.2d 1157 (3d Cir. 1973); *United States* v. *Ross,* 477 F.2d 551 (6th Cir. 1973).

Whether *Ham* has established a fixed constitutional requirement that is applicable in all cases where the defendant is a member of a minority race is of little moment to us. Rule 24(a), unlike its federal counterpart, specifically permits an inquiry as to the presence of prejudice in those who have been summoned for jury duty. It is indeed fitting that an inquiry be made as to a juror's racial feelings or beliefs. Nobody can argue with the proposition that jurors should be impartial. While the Court in *Ham* agreed as to the necessity of inquiry in this area, it did note that the trial court is "not required to put the question in any particular form, or to ask any particular number of questions on the subject, simply because requested to do so by petitioner." *Ham* v. *South Carolina, supra* at 527, 93 S.Ct. at 850, 35 L.Ed.2d at 50. This statement reaffirms the oft-repeated principle that the scope of examination of prospective jurors and their disqualification is a matter which lies within the sound discretion of the trial justice. *State* v. *Nault,* 112 R. I. 687, 314 A.2d 627 (1974); *State* v. *Palmigiano,* 111 R. I. 739, 306 A.2d 830 (1973). The exercise of this discretion does not mean that he must permit every question on this subject that can be devised by an ingenious attorney. It may suffice that a brief question or two be asked or even that a more general query be made as to whether the juror is able to judge the case fairly because of the race, creed, or color of the defendant. *United States* v.

*Grant,* 494 F.2d 120 (2d Cir. 1974). The extent of the inquiry of course depends upon the replies received to the questions asked.

Having established a guide for the trial court, we now look at the three-day voir dire that preceded the presentation of testimony in the instant case. Unlike the justice in *Ham,* the trial justice who presided at defendant's trial allowed defense counsel to question each prospective juror about his racial beliefs or relationships with members of the black race. About twenty of the forty-odd jurors who participated in the voir dire were excused by the trial justice for a variety of reasons including the presence of a sick relative at home whose care precluded the possibility of one serving on a jury that was to be sequestered for a considerable period of time, an intimate acquaintanceship with some of the named prosecution witnesses, a determined reluctance by some to serve as a juror on a rape case, and fixed opinions of guilt by others arising from the pretrial publicity. However, as to those who were not so excused but who were interrogated by counsel, each and every one of them was asked the following, or a substantially similar, question by the defense:

"Q Now the complainant in this case, ma'am is a young white girl. She's about 18 or 19 years old and the defendant, as you can see, is a black young man. He has been charged in the indictment, which as you know, merely is an accusation, with raping this young lady and kidnapping her and two other charges of assault with a dangerous weapon. Now I'd ask you to think and consider in conscience and what, if those facts; namely, that the complainant is white and the defendant is black, whether that would prevent you because of the race of the parties from really zeroing in on the question you're here to decide, the guilt or innocence of the defendant."

Each juror gave a negative response to this question and

assured the trial justice and trial counsel that his verdict would in no way be influenced by the differences in the coloration of prosecutrix's and defendant's pigmentation.

Furthermore, of the twelve jurors who actually went to the juryroom to consider defendant's guilt or innocence, six were never asked about a black's alleged sexual superiority or aggressiveness. One of the remaining six gave a reply. She said she did not believe that a black person is "sexually aggressive" because she had worked with blacks and "we had no problems." Four other jurors who heard the defense question informed the trial justice that they either had blacks for friends, or worked with blacks or had blacks for schoolmates. The remaining juror was a salesman for a Woonsocket advertising business. He apparently was the only one of the six who was asked about blacks and sexual matters but indicated no social or business contacts with members of the black race. Nevertheless, he was asked a question that focused his attention in no uncertain fashion on defendant's race and how this factor related to an impartial determination of his fate. The juror assured the trial justice and counsel that the fact that the pending case involved a black man charged with the kidnap-rape of a white female would not inhibit him from deciding the issue of guilt or innocence strictly on the evidence and whatever exhibits were presented at the trial.

It is our belief that a sufficient inquiry was made by the trial justice and trial counsel so that the 12 jurors who returned the guilty verdicts were well aware that they were dutybound to reach verdicts that responded to the merits of the case rather than to the color of defendant's skin. The record indicates their solemn promise to attain this goal.

Before leaving this facet of defendant's appeal, we offer

one additional comment on the discretion exercised by the trial justice.

During the voir dire, the defense was permitted to ask a gentleman apparently of Italian parentage if he would be more prone to believe the prosecutrix because she, too, was of Italian ancestry. The defendant contends that the trial justice's allowance of an inquiry relating to the prosecutrix's heritage and his refusal when it came to matters of sex are proof of an abuse of discretion. We think not.

We would point out that the so-called sex questions were somewhat indefinite in that they assume that each of the potential jurors has a magnificent mastery of the English language. Having in mind that the individuals who are summoned for jury duty possess varying levels of educational achievement and sexual sophistication, we believe that when asking a potential juror his belief as to the sexual "prowess," "superiority," or "aggressiveness" of the black male vis-à-vis the white, the inquirer by the use of such terms can conjure up in the mind of the persons who are to answer a variety of replies depending on the background of the person being asked. Perhaps the defense had in mind the following question which appears in *Rodgers* v. *State,* 4 Md.App. 407, 410, 243 A.2d 28, 31 (1968);

> "Do you believe that the members of the Negro race have a greater inclination to commit sex crimes than members of other races?"[3]

The impreciseness of the sexual inquiries was lacking when the juror was asked about his affinity with the prosecutrix. There, the query was simple, clear and direct. We see no abuse of discretion.

---

[3]The Maryland court, in upholding the trial court's refusal to allow the use of such an inquiry observed that there was no necessity for its employment, as the field of prejudice had been well explored through the use of other inquiries.

The defendant, who was in his late teens at trial time, argues that his right to be tried by a representative cross-section of the community has been violated. In this jurisdiction, jurors are selected from the names of registered voters. The pertinent statute lists a minimum age for jurors—it is 21 years of age. General Laws of 1956 (1969 Reenactment) §9-9-1, as amended by P. L. 1972, ch. 55, §1. The defendant was tried by an all-white jury that at one time during the voir dire had an average age of 44.6 years.

Recently, we alluded to rulings of the United States Supreme Court that require the party complaining about the absence from a jury of an identifiable segment of the community to prove that the lack is the result of a preconceived plan perpetrated by those responsible for the preparation of the jury lists. *State* v. *Clark,* 112 R. I. 270, 308 A.2d 792 (1973). There is a complete absence of such proof in this record.

The Supreme Court in speaking of a purposeful and arbitrary exclusion of qualified people from jury service has stated:

> "It has long been accepted that the Constitution does not forbid the States to prescribe relevant qualifications for their jurors. The States remain free to confine the selection to citizens, to persons meeting *specified qualifications of age* and educational attainment, and to those possessing good intelligence, sound judgment, and fair character." (emphasis added) *Carter* v. *Jury Commission,* 396 U. S. 320, 332, 90 S.Ct. 518, 525, 24 L.Ed.2d 549, 559 (1970).

The Court then went on to point out that nearly every state had established a minimum age for jurors. It specifically noted that Rhode Island had established a minimum age of 25 years. At its January 1972 session, our General Assembly reduced the juror's minimum age requirement to 21. Earlier, at the same session, the Legis-

lature had lowered the age of majority from 21 to 18. Public Laws 1972, ch. 20, §1, now cited as G. L. 1956 (1969 Reenactment) §15-12-1.

We think it quite clear that a state can constitutionally prescribe specific age qualifications for jury members despite the fact that in doing so an individual may be old enough to vote but too young to sit on a jury. *People* v. *Scott*, 17 Ill. App.3d 1026, 309 N.E.2d 257 (1974); *Johnson* v. *State*, 260 So.2d 436 (Miss. 1972); *see Commonwealth* v. *Fisher*, 447 Pa. 405, 290 A.2d 262 (1972). Even though one can now enter into a binding contract at 18, he must wait until he becomes 21 before he can serve on a Rhode Island jury. Accordingly, there is no deprivation of the defendant's sixth and fourteenth amendment rights because the General Assembly has limited eligibility to serve on the state's juries to those persons who are 21 years or older.

The defendant's appeal is denied and dismissed.

*Richard J. Israel*, Attorney General, *Donald P. Ryan*, Asst. Attorney General, *R. Raymond Greco*, Special Asst. Attorney General, for plaintiff.

*William F. Reilly*, Public Defender, *Joseph M. Hall*, Asst. Public Defender, *Walter R. Stone*, Asst. Public Defender, for defendant.