410 A.2d 127.

STATE *vs*. DONALD SEPE AND VITO DeLUCA.

JANUARY 15, 1980.

PRESENT: Kelleher, Doris and Weisberger, JJ.

WEISBERGER, J.   This case comes before us on appeal from a judgment of conviction of usury and extortion entered in the Superior Court against the defendants after trial on a criminal information setting forth said charges against the defendants jointly. The facts as set forth in the testimony of various state's witnesses are as follows.

The complaining witness, Martin Emeno (Emeno), had encountered financial difficulty in April of 1974, was unable to borrow from conventional sources, and approached his friend, defendant Donald Sepe (Sepe), with a request for a $2,000 loan. Sepe represented that it would be necessary for him to discuss the matter with his partner, defendant Vito DeLuca (DeLuca), with whom the complaining witness was also acquainted. In addition, Sepe indicated that if the loan were granted, it would be necessary for Emeno to pay an interest charge of $75 per week and to repay the principal of the loan in a lump sum by the end of the month. Later that same day, defendants went to Emeno's Manton Avenue grocery store. DeLuca entered the store and delivered $2,000 in

cash to Emeno. Emeno thereafter paid Donald Sepe $75 in cash each Friday until September 16, 1974, when his store burned down. In late September 1974, Emeno endorsed over to Sepe a check in the amount of $906.94, which had been made payable to Emeno from the Joslin Multi-Service Center. This check was later cashed by Vito Deluca.

Between September and December 1974, Emeno received several telephone calls from Sepe asking for the weekly interest payment. In December 1974, Sepe and a friend went to Emeno's home looking for additional money. During that visit, Emeno's father-in-law, one Norman Saucier, agreed in Sepe's presence to obtain a loan so that Emeno might pay an additional $1,500 to Sepe. That loan was obtained, and on or about December 6 or 7, 1974, Emeno and his father-in-law went to Sepe's house with a check for $1,500 payable to Donald Sepe. Michael Sepe, Donald's brother, accepted the check and gave Emeno a receipt for it.

In January and February 1975, Sepe telephoned Emeno frequently, seeking additional payments on the loan which he still considered to be outstanding; but Emeno was unable to make any payments at that time. In February 1975, while riding in Sepe's automobile, Emeno suggested he give Sepe a diamond ring as a further payment. Emeno testified that Sepe stated that he definitely wanted to know when the ring would be available and that if Emeno "pulled any monkey business or anything he was going to bust my head." The ring was delivered to Sepe on February 5, 1975.

The next significant contact between Sepe and Emeno occurred in early March 1975, when Sepe telephoned early in the morning and told Emeno that he would be picked up at home in half an hour. Emeno waited outside because, he said, he feared Sepe and DeLuca and did not want them to come inside his home. Sepe and DeLuca arrived shortly thereafter and drove Emeno to the Vic Calise Bakery on Hawkins Street in Providence. Emeno testified that during the drive, DeLuca and Sepe inquired whether Emeno had insurance on his house and whether it might be possible for them to break and enter into the house, steal some valuables, collect the insurance money, and return the goods to Emeno later.

In April 1975, while Emeno was in the process of moving, Sepe drove to Emeno's home and stated that he would be back at nine o'clock that same night. Later that night, Sepe returned with his brother and was informed that Emeno was moving because he could no longer afford the mortgage payments on his home. Emeno testified at trial that Sepe then stated that he could have taken over the house and burned it down, but his brother observed afterward that he didn't think taking the house over "was worth it." Later that same evening, Emeno drove with Sepe to the Manton Social Club. On the way Sepe asked Emeno whether he still owned his Cadillac. Emeno replied that he had had to give it up because he could not afford the payments. At this juncture Sepe told Emeno that he was "stupid" because they could have "worked" the car with the insurance company. He then added, "'I ought to bust your head,'" and then said, "'I should have done it a long time ago,'" and, "'I should do it now.'" the defendant DeLuca had made a similar threat to Emeno's father-in-law concerning Emeno in November 1974.

Emeno's wife testified that she was "petrified" of the two defendants and had placed padlocks on her home in Warwick for fear of their entering. On one occasion Sepe telephoned her concerning her husband's whereabouts. Sepe suggested he had heard rumors that Emeno had left the state. Sepe further stated that "he (Sepe) had done this before and would do it again." She construed Sepe's remark as a threat. Ultimately in October of 1975, she went to the office of the State Police and filed a criminal complaint.

Peter Nevola, a principal examiner of the banking division of the Department of Business Regulation, testified that on the basis of testimony given, the rate of interest collected from April of 1974 through December 6, 1974, was 233 percent. Taking into account the payments made from the begining of April 1974 to September 16, 1974, aggregating a total of $1,800; the payment of $906.94; the payment on December 6, 1974, of $1,500; and the transfer on February 5, 1975, of a ring with a cost value of $405 -- and assuming that all of these payments were for interest on the original loan of $2,000 -- Mr. Nevola testified that this total would

constitute interest from the date of the loan to the time of trial of 207.5 percent per annum. In the event that some of these payments were in fact applied to reduction of principal, the interest rate would have been even higher. Nevola testified that under any theory, payments made from the date of the loan in April 1974 until the date of trial on a loan of $2,000 would exceed the maximum permitted rate of 21 percent per annum.

In support of their appeal, defendants raise six issues.

The first issue constitutes a challenge to the admission of evidence concerning the alleged proposal by defendant Sepe to commit certain other crimes: (1) the breaking and entering into Emeno's house so that defendants might steal valuables, collect insurance money, and then return the valuables to Emeno; (2) the proposal by Donald Sepe that he and his brother could take over the Emeno house and later burn it down; (3) the proposal that he could have "worked" Emeno's car with the insurance company.

It is a generally accepted rule that evidence indicative of a bad character or a criminal disposition on the part of a defendant is inadmissible to prove the likelihood that he committed a particular offense. *State* v. *Mazzarella*, 103 R.I. 253, 236 A.2d 446 (1967); *State* v. *Colangelo*, 55 R.I. 170, 179 A. 147 (1935); *McCormick's Handbook of the Law of Evidence* §190 at 447 (2d ed. Cleary 1972). These authorities nevertheless recognized certain exceptions to the general rule. Although these exceptions cannot be stated with categorical precision, evidence of other conduct, even if criminal, is competent to prove the specific crime charged when it tends to establish (1) motive, (2) intent, (3) the absence of mistake, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others, or (5) the identity of the person charged with the commission of the crime on trial. *Id.* at 448-51. *See People* v. *Molineux*, 168 N.Y. 264, 61 N.E. 286 (1901). In *State* v. *Mancini*, 108 R.I. 261, 266-67, 274 A.2d 742, 745 (1971), we recognized that incidents previous to the crime charged, even if criminal in nature, might be admissible in order to establish an intent, motive, plan, design,

or scheme. *See also State* v. *Colangelo,* 55 R.I. at 173-74, 179 A. at 149.

Wigmore points out that evidence of criminal conduct tending to show that a defendant had formed a settled purpose to appropriate certain property which could only be obtained by doing several preliminary acts, the last of which was the very criminal act for which defendant was charged, are admissible, and that the criminality of such prior acts does not affect their admissibility. 2 Wigmore, *Evidence* §§304, 305 (3d ed. 1940). "Either they [prior acts] are relevant by the above tests, or they are not; if they are not, they are rejected because they are irrelevant; if they are, they are received in spite of their criminality." *Id.* §305 at 205. *See Commonwealth* v. *Robinson,* 146 Mass. 571, 16 N.E. 452 (1888).

In the case at bar, the proposals to commit other acts of a criminal nature in order to obtain payment of the sums believed to be due by defendants formed part of an overall scheme or design to obtain these monies by fair means or foul; they were thus relevant to complete the story of the criminal acts for which defendants were on trial by proving the immediate context of happenings near enough in time and place to be a part of the same transaction under what has been referred to as the "complete story" principle. *State* v. *Villavicencio,* 95 Ariz. 199, 201, 388 P.2d 245, 246 (1964); McCormick, *supra* §190(1) at 448. The admission of this evidence, therefore, did not constitute error.

The second issue raised by defendants is the propriety of the refusal by the trial justice to allow impeachment of the credibility of the complaining witness, Emeno, by cross-examination concerning his arrest or his having been charged by the police for the alleged crime of embezzlement. Under the provisions of G.L. 1956 (1969 Reenactment) §9-17-15, it has been long held in Rhode Island that the credibility of a witness may be impeached by a showing of a conviction or sentence for any crime, including a misdemeanor. However, the credibility of a witness may not be impeached merely by a showing of an arrest or criminal accusation. *State* v. *Milne,* 95 R.I. 315, 325, 187 A.2d 136, 141 (1962), *appeal dismissed,*

373 U.S. 542, 83 S. Ct. 1539, 10 L. Ed. 2d 687 (1963); *State v. Christofaro*, 70 R.I. 57, 37 A.2d 163 (1944). The defendant argues that cross-examination on such a subject would be allowed under Rule 608(b) of the Federal Rules of Evidence. The short answer to this contention, assuming arguendo that it has merit, is that the Federal Rules of Evidence have not been adopted by Rhode Island. Should the court consider the adoption of such rules, the change would be better accomplished by exercise of its rule-making power rather than on a piecemeal case-by-case basis. Therefore, we decline to set aside our settled rule at this juncture. The decision of the trial justice in excluding this evidence was correct.

The third issue raised by defendants is based upon the denial of their request for a mistrial as a result of a statement by Emeno's wife that she had purchased a German shepherd dog "[b]ecause of Donald Sepe and Vito DeLuca." The trial justice denied the motion for mistrial and defendants contend that this was reversible error. We said in *State v. Verdone*, 114 R.I. 613, 618, 337 A.2d 804, 808 (1975), where comments by a prosecutor were under consideration, that the question at issue was whether the statements had so inflamed the jury as to deprive the defendant of a fair trial. In order to be prejudicial, such remarks must not only be extraneous to the issues but also tend to inflame and arouse the passions of the jury. In the case at bar, the question of ownership of a pet had been raised by defense counsel in cross-examination. It cannot be said that redirect examination on this subject was wholly extraneous to the issues. It is highly doubtful, furthermore, that the statement by the witness would tend to arouse the passions of the jury so as to deprive defendants of a fair trial. As said in *State v. Pailin*, 114 R.I. 725, 729, 339 A.2d 253, 255 (1975),

> "Motions to pass are addressed to the sound discretion of the trial justice. He has a 'front-row seat' at the trial and can best determine the effect of the improvident remarks upon the jury. His determination is to be given great weight and will not be disturbed unless clearly wrong."

Under the circumstances in the instant case, the trial justice considered this evidence to be relevant on the issue of Emeno's wife's having been placed in fear of defendants by their threatening statements and conduct. We are of the opinion that the trial justice was not clearly wrong in admitting the evidence and in refusing to declare a mistrial.

The fourth issue raised by defendants challenges the striking of testimony offered by the defense concerning the reputation of the complaining witness for veracity. Counsel for defendant Sepe presented one Gustavo Gesualdo as a witness and sought to elicit testimony from him concerning Emeno's reputation for truth and veracity in the community in which he was employed. After several tentative efforts by counsel to elicit testimony concerning specific contacts that this witness had had with Emeno, the trial justice and counsel entered into a colloquy during which the trial justice suggested that the controlling case was *Kolb* v. *Union Railroad,* 23 R.I. 72, 49 A. 392 (1901); hence, he would accept evidence of Emeno's general reputation either in the community in which he resided or in which he was employed. The trial justice also referred to McCormick's treatise on evidence. The general rule set forth in McCormick, *supra* §44 at 92, that a witness may be impeached by proof of bad reputation for truth and veracity as of the time of the trial, is expressed as follows:

> "The crucial time when the character of the witness under attack has its influence on his truth-telling is the time when he testifies. But obviously reputation takes time to form and is the resultant of earlier conduct and demeanor, so that it does not precisely reflect character at a later date. The practical solution is to do what most courts actually do, that is, (1) to permit the reputation-witness to testify about the impeachee's 'present' reputation, as of the time of the trial, *if he knows it,* and (2) to permit testimony as to reputation (which is usually a settled, continuing condition) as of any time before trial which the judge in his discretion finds is not too remote to be significant." (Emphasis added.)

In the case at bar the impeaching witness had had contact with Emeno approximately two and a half years prior to trial. However, when the trial justice asked whether the witness knew what Emeno's reputation was during the time just prior to trial, the witness answered in the negative. Under all of the circumstances, we cannot say that the striking of such testimony regarding reputation constituted an abuse of discretion. *See United States* v. *Null,* 415 F.2d 1178, 1180 (4th Cir. 1969); *Vaughn v. Clarkson,* 19 R.I. 497, 34 A. 989 (1896).

The defendants' fifth assertion of error is based upon the trial justice's denial of their motion to pass the case as a result of the prosecutor's comments on defendants' failure to produce a witness. During final argument, the prosecutor suggested that if Michael Sepe (brother of defendant Donald Sepe) had not received the $1,500 check payable to defendant, why had he not testified in the case? This remark was improper under our holding in *State* v. *Jefferson,* 116 R.I. 124, 353 A.2d 190 (1976). The trial justice recognized this impropriety and gave an immediate cautionary instruction in which he stated to the jury:

> "[T]here is no burden of any nature whatsoever in this case, for the defendants to produce any testimony or to prove anything. The burden is solely and completely upon the State. You cannot infer that the absence of any witness for the defendants creates any unfavorable situation for the defendants. You cannot draw any unfavorable conclusions or inferences of any nature from the fact that a particular witness is not produced."

Later in the charge to the jury, the trial justice reemphasized that the defendant has no burden or obligation to prove anything and that the burden of proof rests entirely upon the state. Here again, it cannot be said that the trial justice abused his discretion in refusing the motion for mistrial, relying instead upon both immediate and final cautionary instructions. *State* v. *Pailin, supra.*

As their sixth issue, the defendants assert that the trial justice committed error in denying the defendants' motions for judgments of acquittal on both the extortion and usury

charges. It is a familiar doctrine that a trial justice confronted with a motion for judgment of acquittal must view the evidence presented in the light most favorable to the state and must draw therefrom all reasonable inferences consistent with guilt. *State* v. *Jefferson, supra; State* v. *Wilbur,* 115 R.I. 7, 339 A.2d 730 (1975). Neither the credibility of the witnesses nor the weight of the evidence is before the court at that time. *Jefferson, supra* at 128-29, 353 A.2d at 194, *Wilbur, supra* at 15-16, 339 A.2d at 735; *State* v. *Crescenzo,* 114 R.I. 242, 256, 332 A.2d 421, 429-30 (1975). An examination of the record in the case at bar indicates that under the foregoing test, there was ample evidence to justify the decision of the trial justice in denying the motions for judgment of acquittal on both counts. There was evidence of threats made by both defendants in regard to the extortion counts. There is further evidence, when viewed in the light most favorable to the state, that both defendants acted in concert in making the loan, in demanding payment therefor, and in achieving receipt of funds significantly beyond the statutory limit of 21 percent per annum. *See* G.L. 1956 (1969 Reenactment) §6-26-2; G.L. 1956 (1969 Reenactment) §6-26-3, as amended by P.L. 1970, ch. 263, §1. Thus, the trial justice was correct in denying the motions for judgments of acquittal on each count.

For the reasons stated, the defendants' appeal is denied and dismissed, the judgment of the Superior Court is affirmed, and the case is remitted to the Superior Court.

Mr. Chief Justice Bevilacqua did not participate.

*Dennis J. Roberts II,* Attorney General, *Alan R. Tate,* Special Assistant Attorney General, for plaintiff.

*John J. Bevilacqua, William A. Gosz,* for defendants.