**STATE**

v.

**Ernest GOMES.**

**No. 95–565–C.A.**

Supreme Court of Rhode Island.

Feb. 18, 1997.

Jane McSoley, Asst. Attorney General, Aaron Weisman, Asst. Attorney General, for Plaintiff.

John F. Cicilline and Vincent Oddo, Providence, for Defendant.

## OPINION

WEISBERGER, Chief Justice.

This case came before us on the appeal of the defendant, Ernest Gomes (Gomes or defendant), from a judgment of conviction entered in the Superior Court for the County of Providence upon a jury verdict finding him guilty of two counts of first-degree child-molestation sexual assault in violation of G.L. 1956 § 11–37–8.1 and one count of second-degree child-molestation sexual assault in violation of G.L. 1956 § 11–37–8.3. The trial justice sentenced the defendant to twenty years' imprisonment on each count, to be served concurrently. In support of his appeal the defendant raises five issues. In respect to each issue raised by the defendant we are of the opinion that the trial justice has not committed error. We therefore deny the defendant's appeal and affirm the convictions below. The facts of this case insofar as they are pertinent to this appeal are as follows. Additional facts will be supplied as needed to discuss the issues raised on appeal.

I

Facts of the Case

In June of 1993, the victim, whom we shall call Fran Doe, was seventeen years old. She went to the Providence police department and filed a complaint, alleging that she had been sexually molested by her maternal grandfather over a period extending from the time when she was five years of age to when she was eleven. Her grandfather, defendant Ernest Gomes, was sixty-seven at the time the allegations of child molestation were made.

Charges were presented to a grand jury, which returned true bills on all five counts of child-molestation sexual assault. Prior to trial the state dismissed one of these counts under Rule 48(a) of the Superior Court Rules of Criminal Procedure because of a statute-of-limitations problem. Trial went forward on the four remaining counts, which related to molestation that had occurred when the victim was eleven years old. Trial occurred before a jury on November 3 to 15, 1994.

By way of background Fran testified that when she was five years old, she was very close to her grandfather. She and her mother lived in Providence, and she would visit her grandparents often since they lived nearby. She testified that defendant was always very affectionate toward her; he would hug and kiss her and pet her all over. He also gave her a special nickname, "Mikey," because like the child in the now-classic Life cereal commercial she liked to eat everything. She testified that the nickname and the affection he showed her made her feel special, as did her perception that he gave her more attention than he did her cousin who was about Fran's age and lived with her grandparents at the time.

The victim testified that this relationship took a more sinister turn, however, when her grandfather began to have her watch pornographic movies with him. She reported that this activity occurred in the den of Gomes's house late at night when everyone else was asleep and when Fran had stayed over because her mother was working late. At first defendant would have her dance around clothed, then later unclothed, imitating the

actors in the pornographic movies. When Fran was seven defendant started to have her manually stimulate him and perform fellatio on him, once again telling her to imitate the actors in the pornographic movies.

Gomes then separated from his wife, Fran's grandmother, and moved in with his daughter, Fran's mother, whom we shall call Carol Doe. Fran, her brother Brian (who was eleven years older than the victim), and Brian's friend, Robert (who was nine years older), lived at this same house. Fran testified that the sexual molestation continued at this new location, with incidents occurring regularly over the year that they lived there. When Fran was in the fourth grade, that is, about nine years of age, her family, including defendant, moved to a new house in Providence. Soon thereafter a family friend, Helene Page, also moved into the household. The defendant lived in an upstairs apartment at this new home. The two events for which defendant was convicted both occurred at this final location.

One incident occurred when defendant was sitting on a rocking chair watching television in his apartment. Fran was sitting on the floor between his legs, defendant pushing her head towards his genitals. Knowing what he wanted from past incidents, she performed oral sex upon him. The other counts were based on an act of intercourse.

During this second incident defendant called downstairs for Fran to bring up some popcorn. When she brought it upstairs, he was sitting in a rocking chair, watching a basketball game. He motioned for her to sit on his lap. When he got up to go to the bathroom, she sat in his rocking chair. When defendant returned, he smelled of gin. Fran got up and sat on his bed in order to allow him to sit down in the chair. The defendant then came to her and, leaning over her, began to kiss her neck. He then knocked her back onto the bed and had penile intercourse with her. She testified that this hurt and that she bled onto the mattress. The defendant then got up and told her to clean off the mattress.

Fran testified that two weeks later defendant again attempted to molest her. He stopped when Fran's brother returned home. Shortly after this last incident defendant had a serious fight with Fran's mother during which he physically attacked her, only stopping when Fran's brother intervened. The defendant left his daughter's house and subsequently reconciled with and moved back with his wife. Because of the animosity created by this fight, Fran had no subsequent contact with her grandfather.

When she was approximately fourteen years old Fran transferred from a religiously sponsored high school, where she had been a good student, to Classical High School. Shortly thereafter she began having problems with her mother. After one particularly serious incident she was removed from her mother's home and placed in a thirty-day residential treatment program run by the Department of Children, Youth and Families (DCYF) and designed to provide counseling to children at risk.

After having been placed in this program, she contacted the social worker assigned to her and revealed the incidents of molestation perpetrated by her grandfather. She then informed her mother.

After the state rested, the trial justice dismissed one count of the indictment, which had alleged digital penetration, for lack of evidence.

At trial Gomes presented a number of witnesses in an attempt to establish two contentions. Through these witnesses he first claimed that he had had no opportunity to commit the crimes. Second, he suggested that Fran had fabricated the charges to put herself back into the good graces of her mother after having been removed from the house. He alleged that she was then persuaded to bring the criminal charges by her mother. Under the defense theory, it was contended that having made the charges, she was now forced to go forward with them. The defendant did not testify.

The defense also contended that Fran had rarely, if ever, been left alone with defendant. Fran's mother, Carol Doe, was portrayed as a very protective person who had always ensured that Fran was carefully watched even though Carol worked long hours at her job. Testimony suggested that

Fran was never left home alone with defendant because he drank excessively. On the second contention, testimony showed that the family was seriously divided and that Carol, as well as others in the family, had volatile tempers. Carol would get angry and not talk to family members. Testimony also suggested that Carol had more than ample reason to be angry with defendant.

After the jury returned guilty verdicts on the remaining counts, the trial justice denied a motion for new trial. He noted in this respect:

> "[F]rankly [I] found the [complaining] witness to be a credible witness, despite the inconsistencies in her testimony. She was articulate, she was going back almost half of her lifetime to recall some events * * *. The defense in this case consisted mainly of bringing in members of the family who had an opportunity to live and be in and about the household who basically testified that there was no opportunity for this defendant ever to be alone with the child when the complaining witness was a child, ergo this event did not take place.

> "There was testimony of long family problems which came to light. In looking at a witness when a witness takes the stand and testifies about sexual molestation, one * * * always asks the question, what's the motive for the small child, now an adult, to come into court and cause the anguish in the family that this trial has obviously caused in this family.

> "I find no motive to lie. I find no motive at all to lie.

> "The inconsistencies of her testimony were pointed out ad nauseam. The jury had the benefit of that type of impeachment. The jury decided to believe the complaining witness. This is an area, quite frankly, where reasonable minds could have differed. They decided the credibility issue in favor of the * * * [complaining witness]."

The defendant's issues on appeal are addressed in the order of presentation in defendant's brief.

## II

### Individual Voir Dire

█ The defendant first argues that each prospective juror should have been individually examined outside the presence of other jurors in respect to his or her personal experiences with sexual abuse or molestation. He contends that only the trial justice, both parties' attorneys, and a stenographer should have been present during this questioning. He claims that the highly personal and sensitive nature of child molestation, when combined with the stigma attached to such events, made it difficult for potential jurors to respond candidly when they were questioned publicly on these subjects.

Prior to trial the trial justice rejected these contentions. He noted that the issue would have been sensitive regardless of how the questioning might be performed. He then proceeded to ask the prospective jurors *as a group* whether, either on account of the nature of the charges or a personal experience involving sexual molestation, anyone would be unable to sit and listen to the evidence and render a fair and impartial verdict in the case. Four prospective jurors then asked to be excused. The trial justice then reiterated to the assembled potential jurors the importance of defendant's being tried by a fair and impartial jury and repeated his query, suggesting that "what you are saying to me now is that *you* couldn't be fair because of the nature of the charges or that you yourself have been a victim of a sexual offense." After this further inquiry six additional jurors asked to be excused. The defendant claims that the trial justice's failure to ask these questions in *private* undermined his ability to receive a trial before an impartial jury. We do not agree.

Our analysis begins with Rule 24(a) of the Superior Court Rules of Criminal Procedure, which provides:

> "*Examination.* The Court may permit a defendant or the defendant's attorney and the attorney for the State to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event, the court shall permit the defendant or the defendant's attorney and the

attorney for the State to supplement the examination by further inquiry or, upon request, shall itself put to the prospective jurors such additional questions as are submitted by the parties or their attorneys. The examination of prospective jurors shall be for the purpose of determining whether a prospective juror is related to a party, or has any interest in the case, or has expressed or formed an opinion or is sensible of any bias or prejudice therein. The examination shall be conducted under oath if requested."

Rule 24(a) encompasses two interrelated principles, the *scope* of questioning that is allowed and the *form* it is to take. Although we have held that the *scope* of examination is within the sound discretion of the trial justice, *State v. Taylor*, 423 A.2d 1174, 1175 (R.I.1980); *State v. Nault*, 112 R.I. 687, 692, 314 A.2d 627, 629 (1974); *State v. Palmigiano*, 111 R.I. 739, 743, 306 A.2d 830, 833 (1973), in the context of racial attitudes and bias we have cautioned that in exercising this discretion, a trial justice "may not thwart a legitimate attempt to decipher the bias of potential jurors." *Taylor*, 423 A.2d at 1175; *see also State v. Spivey*, 114 R.I. 43, 48, 328 A.2d 414, 417 (1974).

Here, however, upon the specific request of defense counsel, the trial justice pursued the desired line of inquiry. He asked the potential jurors not once but twice if any personal experience with sexual offenses would render them unable to be impartial. The *scope* of his questioning was clearly adequate to uncover any bias, given the circumstances of the case. *Cf. Spivey*, 114 R.I. at 49–50, 328 A.2d at 417–18 (inquiry by trial justice sufficient to uncover racial bias).[1] The novelty of defendant's claim lies in his challenge to the *form* in which the questioning occurred.

Rule 24(a) which conforms with G.L.1956 § 9–10–14 leaves the decision of *who* questions potential jurors within the discretion of the trial justice. However, the rule is silent in regard to the format that the questioning should be conducted in. The defendant's claim, however, is related to his right to decipher any relevant bias on the part of potential jurors. It is in fact analytically similar to the contentions we first considered in *Spivey*. We therefore shall review the trial justice's ruling for an abuse of discretion, which has the effect of thwarting a legitimate attempt to decipher a relevant bias of members of a panel of potential jurors, thereby compromising the right to an impartial jury. *Taylor*, 423 A.2d at 1175. The defendant claims that individual potential jurors may not have answered the trial justice's questions truthfully because of the stigma attached to answering in public.[2] We do not agree.

We presume that jurors, whether or not they are placed under oath, *see* Rule 24(a), will recognize the seriousness of their task and will therefore fully and truthfully answer the questions put to them by the trial justice. The record in this case provides nothing from which we would conclude otherwise. The record in fact indicates that ten jurors did step forward and were excused. We are of the opinion that the trial justice's

1. The defendant's reliance on cases involving pretrial publicity, *see, e.g., United States v. Davis*, 583 F.2d 190 (5th Cir.1978), is misplaced. In those situations the issue for the reviewing court is the question of whether adequate inquiry was allowed so that any bias might be revealed. In this case the question posed by the trial justice was a simple one involving matters that would be quite clear to a potential juror. A yes or no answer would suffice to reveal any prejudice. More in-depth questioning on this subject would seem to have served no additional purpose, nor do we think defendant suggests it would. *See also United States v. Dellinger*, 472 F.2d 340, 366–70 (7th Cir.1972) (inadequate inquiry to reveal prejudices given that an individual might be unaware of his or her own bias on the subject of inquiry).

2. The defendant cites several cases wherein it has been alleged that the answers of one juror will "infect" the other jurors so as to necessitate individual private questioning. *See, e.g., Lowery v. State*, 547 N.E.2d 1046, 1049 (Ind.1989) (contention made that answers regarding death eligibility will condition jurors to impose death sentence). This situation might potentially arise in highly unusual circumstances such as questioning jurors about exposure to press reports. In such a case a juror's answers could alert others in the jury pool to the existence of prejudicial publicity. This is clearly not a case with such unusual circumstances.

tactful form of questioning did not impede the potential panel members' ability to answer truthfully. Moreover, we are not persuaded that individual questioning would have improved on the method employed. Potential jurors were asked as a group a two-part question: did either the *subject matter of* or *personal experience with* sexual molestation make it impossible for them to be impartial? Combining these questions, the trial justice ensured that potential jurors need not associate themselves with an upsetting or embarrassing experience in order to be excused from the panel. Asking each juror more pointed questions in private might have actually increased each juror's discomfort over that which they might have encountered under the expedient device utilized by the trial justice.

Because no showing has been made that defendant was unable to determine the relevant biases of jurors in this case, we uphold the decision of the trial justice to question the jurors as a group.

### III

### Admission of Testimony by the Victim Concerning Uncharged Acts

█ The defendant filed a motion in limine to exclude testimony by the victim about uncharged acts that were committed against her by defendant. The prosecution maintained that Fran's full testimony was necessary to show a special relationship between her and the grandfather whose abuse eventually led up to the charged acts. The prosecutor claimed that the testimony was relevant because it showed a *common scheme* on the part of defendant to abuse the special relationship he had with his granddaughter. Defense counsel contended that the testimony only strengthened the prosecution's case because it was "cumulative." He therefore asked that the testimony be excluded. The trial justice allowed Fran's full testimony, noting that it tended to show defendant's common design and plan in respect to the victim and that it was relevant in that it showed his attitude regarding sexual activity with the victim. He also suggested that it was necessary to present the victim's full testimony, so the prosecution could show a

long-standing relationship to support its case. The admission of such evidence, it is contended, was in error. We reject this contention.

█ Evidence of other crimes or bad acts is usually considered so prejudicial that it is per se inadmissible regardless of any relevancy that it might have to show the propensity of a defendant to have committed the charged crime. *State v. Sepe*, 122 R.I. 560, 565, 410 A.2d 127, 130 (1980); *see generally* Advisory Committee Note to Fed. R.Evid. 404; *McCormick on Evidence* § 190 at 797–98 (4th ed. Strong 1992). Two exceptions to this general rule of legal relevancy have been accepted in Rhode Island. First, if the prior incidents are interwoven with the charged offense they are admissible, *Sepe*, 122 R.I. at 566, 410 A.2d at 130–31; *State v. Colangelo*, 55 R.I. 170, 173–74, 179 A. 147, 149 (1935), to allow a trier of fact to hear a complete and, it is to be hoped, coherent story so as to make an accurate determination of guilt or innocence. Second, evidence may be admissible under Rule 404(b) if it tends to show guilty knowledge, intent, motive, preparation, plan, or identity on the part of a defendant.

This court first considered the issue of "other acts" testimony under Rule 404(b) in a sexual molestation case in *State v. Jalette*, 119 R.I. 614, 382 A.2d 526 (1978). In *Jalette*, the state sought to admit testimony by the victim's mother regarding a prior uncharged act of molestation committed against the victim by the defendant. Adopting the reasoning contained in *People v. Kelley*, 66 Cal.2d 232, 57 Cal.Rptr. 363, 424 P.2d 947, 955 (1967), we held that "evidence of other not too remote sex crimes with the particular person concerned in the crime on trial may be introduced to show the accused's 'lewd disposition or * * * intent' towards the person." *Jalette*, 119 R.I. at 627, 382 A.2d at 533. The lewd-disposition or intent exception of *Jalette* was extended to cover testimony by the victim concerning uncharged acts in *State v. Cardoza*, 465 A.2d 200, 203 (R.I. 1983).

█ This rule is subject to three restrictions. First, the evidence should be used sparingly and only when reasonably neces-

sary. *Jalette,* 119 R.I. at 627, 382 A.2d at 533. Other-acts evidence should be excluded if it is merely cumulative. *Id.* Second, the evidence is only to be admitted when the exception is relevant to proving the charges lodged against the defendant. *Id.* Finally, a trial court should designate with particularity the specific exception to which the evidence is relevant and instruct the jury concerning the limited use for which the evidence is to be considered. *Id.* at 627–28, 382 A.2d at 533.

The trial justice in this case adhered closely to these admonitions. He ruled that the evidence was both necessary and relevant, and he listed the specific uses for which the evidence was being admitted. The jury was appropriately instructed in respect to the limited uses for which the victim's testimony concerning uncharged acts was to be used. The trial justice properly adhered to the limitations placed on the admissibility of this type of evidence. Counsel at oral argument suggested that this court's recent decision in *State v. Quattrocchi,* 681 A.2d 879 (R.I.1996), cast doubts on the rule of *Jalette.* We do not agree.

In *State v. Pignolet,* 465 A.2d 176 (R.I. 1983), this court extended the Rule 404(b) exception to allow the showing of lewd disposition or intent toward the victim through the testimony of others in the household who claimed to have been molested by the defendant. In *Quattrocchi* this court refused to extend this doctrine still further to allow such a showing by the testimony of others who lived outside the household who claimed to have been molested by the defendant. We noted:

> "We are of the opinion that *Pignolet* represented the extreme beyond which we are unwilling to extend the other-crimes (or bad-acts) exception because of its overwhelming prejudice to defendant and its tendency to be viewed by the trier of fact as evidence that defendant is a bad man, and that he has a propensity toward sexual offenses and, therefore, probably committed the offense with which he is charged." *Quattrocchi,* 681 A.2d at 886.

The concerns expressed by members of this court in regard to the testimony of unrelated third-party victims of sexual molestation do not extend to testimony about uncharged additional acts committed against the victim herself as in this case or in *Jalette.* Nothing in our opinion in *Quattrocchi* casts doubt upon the use of other-acts testimony to show a lewd disposition toward the victim herself.

## IV

### Motion for Mistrial

■ The defendant next contends that his motion for a mistrial based upon his claim that the prosecution violated a court order was improperly denied.

The prosecution concluded its questioning of the victim on a Friday. The trial was subsequently recessed for the weekend during the middle of Fran's cross-examination by defense counsel. Before recessing, the trial justice told Fran that she was not to discuss her testimony with anyone. Upon the resumption of cross-examination Monday morning, defense counsel learned that the prosecutor had provided Fran with a transcript of her grand jury testimony, which she had reviewed that morning before coming to court. The defendant moved for a mistrial.

The prosecutor denied that he had violated the trial justice's order. He said he had not had any discussions with the witness and had merely given her a transcript of her grand jury testimony. He indicated that this was harmless since she already had a tape-recorded copy of the same testimony. The trial justice denied the motion without comment.

■ It is within the sound discretion of a trial justice to grant or to deny a motion for a mistrial. *State v. Stewart,* 663 A.2d 912, 925 (R.I.1995); *State v. Mastrofine,* 551 A.2d 1174, 1177 (R.I.1988); *State v. Brown,* 522 A.2d 208, 210 (R.I.1987). When a trial justice rules on such a motion, his or her denial is accorded great weight by this court and will not be overturned on appeal unless it is clearly wrong. *Stewart,* 663 A.2d at 925; *Mastrofine,* 551 A.2d at 1177. We accord great deference to these determinations because it is the trial justice who has a front-row seat at the trial, who is most aware of the circumstances surrounding the actions

that have led to the motion for a mistrial, the degree of prejudice to the parties, and the degree of fault each party bears in creating that prejudice. *Brown,* 522 A.2d at 210–11.

The defendant relies upon *State v. Burke,* 522 A.2d 725 (R.I.1987), for the proposition that the judge erred in failing to grant his motion. The defendant's reliance on *Burke* is misplaced. In that case we held that the trial justice erred by excluding two witnesses, not for his *failure* to do so. *Id.* at 729. *Burke* does, however, implicitly recognize that a trial justice may impose the serious sanction of exclusion of a witness to ensure that its orders are not intentionally flouted. *Id.*; *cf. United States v. Arruda,* 715 F.2d 671, 684 (1st Cir.1983) (no error in failing to grant a mistrial when violation of court order was neither in bad faith nor intentional). However, recognizing the ability of a trial justice to impose a sanction is a very different matter from requiring that one be imposed. Only in the most unusual situations would this court use its supervisory powers to impose a per se rule to guard the integrity of the judicial process. No such showing has been made in this case.

The second reason to grant a mistrial would be to ensure that a defendant was not deprived of a fair trial. The First Circuit stressed this fact while noting that "[d]epending on the seriousness of the government's misconduct, a showing of actual prejudice could be required before a court could order a mistrial or dismissal." *United States v. Rossetti,* 768 F.2d 12, 15 (1st Cir.1985). Because defendant's contention is grounded in his fair-trial rights, we shall reverse only for an abuse of discretion that results in actual prejudice to him. *See United States v. Bagley,* 473 U.S. 667, 678, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481, 491 (1985); *Stewart,* 663 A.2d at 925.

It is clear from the record that no actual prejudice exists in this case. There would seem to be little incremental benefit to the witness in having reviewed her grand jury testimony transcript, especially since she already had in her possession a taped version. Her testimony on direct examination had already concluded, and the defense, which had the written police statement, grand jury

testimony, and her testimony upon direct examination, was fully able to point out any inconsistencies since they were already in the record. As a practical matter the only effect that reviewing the prior testimony could possibly have had was to enhance the witness's poise on the stand. This ultimately goes to the credibility of the testimony. Since the jury was listening when it was revealed that Fran had refreshed her memory, they could have taken this fact into account in making their credibility determinations. *See Arruda,* 715 F.2d at 684. Since no actual prejudice has been shown, the trial justice did not err in his refusal to pass the case.

## V

### Exclusion of a Defense Witness as a Sanction for a Rule 16 Violation

■ The defendant next argues that the trial justice erred in failing to allow him to supplement his discovery in order to present a witness not previously disclosed by counsel for the defense. This request was made after the state had rested and during the presentation of defendant's evidence.

The defendant sought to present an additional witness, Jacques G. Susset, M.D., whom counsel described as a specialist in urology, who, counsel further claimed, had treated defendant starting on September 11, 1987, for impotence. The date of claimed impotence was approximately contemporaneous with the date of the act of penile intercourse for which defendant was convicted. Although admitting he knew of the witness, counsel for defendant claimed that he had not listed him as a witness as required by Rule 16(b) of the Superior Court Rules of Criminal Procedure because he had not recognized the significance of the witness until the victim's testimony on the first day of trial indicated that defendant's penis had become "enlarged and rigid" during certain acts of molestation and that he had ejaculated.

The prosecutor claimed he was being ambushed. He said he would be prejudiced if the witness testified since he would have no opportunity to hire an expert to perform his or her own tests. He pointed out that the evidence went to the ultimate issue of impos-

sibility so defendant must have been aware of its importance. The trial justice did not accept defense counsel's explanation, inferring that counsel should have known that the ordinary act of intercourse requires some rigidity in order to achieve penetration. He further suggested that defendant would not have been prejudiced in disclosing Dr. Susset as required by Rule 16(b) and that having done so would have allowed the state to conduct its own investigation. He therefore sanctioned defendant by excluding the witness from testifying.

A trial justice is in the best position to determine whether any harm has resulted from noncompliance with Rule 16 and how best to mitigate this prejudice. We shall therefore sustain a trial justice's rulings on the issue absent a clear abuse of discretion. *State v. Coelho*, 454 A.2d 241, 245 (R.I.1982). "However, the trial justice's discretion under the rule is limited, bounded by law, and reviewable." *Id.* Our cases have counseled the trial justice, and this court on review, to consider in fashioning a sanction for a Rule 16 violation "(1) the reason for nondisclosure, (2) the extent of prejudice to the opposing party, (3) the feasibility of rectifying that prejudice by a continuance, and (4) any other relevant factors." *Id.*; *State v. Garcia*, 643 A.2d 180, 187 (R.I.1994); *State v. Boucher*, 542 A.2d 236, 241 (R.I.1988).

In reviewing the sanction imposed in this case, we note that the purpose of Rule 16 "is to ferret out procedural, rather than substantive, prejudice," *Coelho*, 454 A.2d at 245, prejudice that would make it difficult for a party to prepare properly for trial. *Id.* Here, although not explicitly accusing defense counsel of sandbagging, the trial justice did find his reason for nondisclosure, to say the least, unpersuasive. The trial justice then found procedural prejudice that he sought to remedy.

The defendant contends that the sanction imposed by the trial justice was too extreme and, therefore, an abuse of discretion under our prior precedents. He suggests that other measures should have been taken to address the procedural prejudice in this case. The cases relied upon by defendant, finding an abuse of discretion in the exclusion of a witness, however, are distinguishable as they all involved situations in which the violation of Rule 16 was without fault or knowledge on the part of the party being sanctioned. *See, e.g., Boucher*, 542 A.2d at 241 ("the information was not withheld * * * either deliberately or negligently"); *Burke*, 522 A.2d at 729–30 (nondisclosure of rebuttal witnesses excused because counsel was surprised by complaining witness's testimony); *State v. Lawrence*, 492 A.2d 147, 149 (R.I.1985) (state had no way of knowing what witnesses it would call to rebut the defendant's testimony); *State v. Ricci*, 472 A.2d 291, 299 (R.I. 1984) (nondisclosure of exhibits used to illustrate testimony inadvertent as state only became aware of them when witness's testimony was being prepared, continuance offered and refused, no prejudice found); *State v. Sciarra*, 448 A.2d 1215, 1219 (R.I.1982) (the defendant's proffered expert testimony was not available until trial because of state's failure to provide needed information requested by the defense upon which the expert opinion would be based; due diligence was exercised in disclosing once that information was made available). In this case the trial justice found defense counsel was at fault in not having disclosed the witness. We cannot say that this factual determination is in error and that, therefore, the exclusion of Dr. Susset's testimony was not excessive as a sanction for deliberate nondisclosure.

Finally, defendant suggests that Dr. Susset's testimony should have been admitted to impeach the victim's testimony. However, the record in this case does not show that an offer of this testimony as impeachment evidence was made to the trial justice. We shall not normally consider grounds for the admission of evidence not raised before the trial justice. *State v. Leonardo*, 677 A.2d 1336, 1337 (R.I.1996) (per curiam). The only exception to this rule "arises when an issue of constitutional dimension based on a novel rule of law is presented of which counsel could not reasonably have known during the course of trial." *Id.*; *Burke*, 522 A.2d at 731. This is not such a case. We therefore do not reach this contention raised by defendant. No error has been shown.

## VI

### Motion for New Trial

 The defendant finally contends that the trial justice should have granted his motion for a new trial upon the basis of testimony about evidence discovered after trial. We do not agree.

On the day after the jury returned a guilty verdict, the prosecutor received a letter purportedly from defendant's godchild, whom we shall call Melissa. Addressed "To Whom It May Concern," the letter ("To whom" letter) claimed that when Melissa lived in defendant's home, at a time prior to the events complained of in this case, defendant had "started molesting me (fondling my breast) when ever he could get me alone." According to the letter, she was asked to leave the household after she complained about defendant's behavior.

The prosecutor turned over a copy of this letter to defense counsel. Defense counsel then engaged a handwriting specialist, Marc J. Seifer, Ph.D., who compared this letter to two exemplars of the victim's mother's handwriting. He concluded that the "To whom" letter had been written by the same person who had written the exemplars furnished by the defense. This, defendant's counsel argued, indicated that the victim's mother, Carol Doe, had forged the "To whom" letter in an effort to frame defendant.

A hearing was held before the trial justice. At this hearing defendant's wife, Mariam Gomes, testified that the "To whom" letter had been written by her daughter, Carol, and not by Melissa, whose handwriting she knew. Seifer testified that he had compared the "To whom" letter to two other writing samples written by Carol and concluded that "the person who wrote the known handwriting also wrote the questioned document handwriting." On cross-examination the prosecu-

tor showed Seifer a second sample, identified as "state's one," which was a handwritten copy of the original "To whom" letter. Seifer indicated that this second letter was identical to the "To whom" letter received by the prosecutor. In response to questions from the trial justice Seifer then indicated that "state's one" was fully identical to the "To whom" letter, whereas the exemplars of Carol Doe's handwriting he had analyzed were only identical in four places to the handwriting in the "To whom" letter. This finding indicated that "state's one" was much closer to the "To whom" letter than the exemplars to which the handwriting expert had initially compared it.[3]

The prosecutor at trial then testified and explained the mystery of "state's one." He said that he had been put in contact with Melissa prior to trial by Carol Doe. Melissa, who lived in Los Angeles, was reluctant to testify but indicated she would send a letter. After he received the "To whom" letter and defendant filed his new-trial motion, the prosecutor again contacted Melissa and explained his need for some confirmation that she had sent the letter. After repeated efforts he finally called Melissa's husband, who was an attorney in Los Angeles, and made the arrangements. He faxed a copy of the "To whom" letter to the husband's law firm in Los Angeles on a Friday. The following Tuesday he received a Federal Express packet purportedly from the husband's law firm containing a hand-copied duplicate of the original "To whom" letter (the "state's one" shown to Seifer on the stand), a further writing sample, and a notarized statement signed by Melissa indicating that she had written and sent the original "To whom" letter.

In response to this explanation defense counsel suggested that the material sent from California had been written by the victim's mother, Carol Doe, Federal Expressed

---

**3.** Seifer had originally compared the "To whom" letter dated November 16, 1994, to two samples dated March 16, 1988, taken from a Bible given by Carol Doe to her mother, Mariam Gomes. Seifer said that both were written in Palmer-method script and that by comparing similarities in how letters were formed in each exemplar, he had been able to make his determination. On cross-examination Seifer admitted that the Palm- er method was extremely common, having been learned by millions of people in the third grade. He also conceded that living with someone, as had Carol and Melissa as children, could produce similarities in their writing. The second sample, "state's one," was given to him on the stand, and he was able to say that it was identical to the "To whom" letter.

to California, then sent back to the Attorney General's office. He suggested that since such a supposition showed that the charges had been fabricated by the victim's mother, a new trial was needed.

The hearing justice ruled that defendant's wife's testimony was suspect, and he discounted it. He was however "troubled" by the expert's opinion that the "To whom" letter was written by the victim's mother. However, he noted that in order to accept defendant's claim, he would have to conclude that there was a conspiracy to commit a fraud on the court. Even though, he felt, the victim's mother, Carol Doe, might be extremely hostile toward her father, there was no reason for Melissa and her husband to participate in a conspiracy. Finally, he noted that the evidence was only "in the nature of impeaching testimony or evidence which showed bias or prejudice." He commented that the victim's mother, who had been called at trial by the defense as a hostile witness, had already been heavily impeached. He stated:

> "[I]n the last analysis, even assuming that [Carol Doe] wrote those letters and that there was cooperation with [Melissa] in sending the communication to the Attorney General's Department in the Court's judgment it would not have [a]ffected the outcome of the verdict by this jury very much. The sole question in my judgment that the jury had to decide was the credibility of the complaining witness, and certainly it was put up by way of a defense that the complaining witness was acting at the behest of [Carol], but proof of charges against this Defendant * * * depended solely upon the testimony of the complaining witness."

"When a motion for a new trial is based on newly discovered evidence, that evidence must satisfy a two-pronged test." *State v. Hernandez*, 641 A.2d 62, 72 (R.I. 1994). The first prong is a four-part inquiry that requires that the evidence be (1) newly discovered since trial, (2) not discoverable prior to trial with the exercise of due diligence, (3) not merely cumulative or impeaching but rather material to the issue upon which it is admissible, (4) of the type which would probably change the verdict at trial. *Id.*; *Brown*, 528 A.2d at 1104. Once this first prong is satisfied, the second prong calls for the hearing justice to determine if the evidence presented is "credible enough to warrant a new trial." *Hernandez*, 641 A.2d at 72 (quoting *Brown*, 528 A.2d at 1104). Because these determinations involve issues of the credibility of witnesses, "[t]his court will not disturb the decision of a trial justice on a motion for a new trial unless he or she overlooked or misconceived relevant and material evidence or was otherwise clearly wrong." *Hernandez*, 641 A.2d at 72.

We are of the opinion that the trial justice in this case correctly followed the applicable legal standard for new-trial motions. He specifically found that the new evidence supporting the motion was cumulative impeachment evidence that would not have affected the verdict in the case. He further found that the evidence was not credible enough to warrant a new trial. We conclude that his rulings were clearly supported by the record in this case and uphold his denial of the motion for a new trial.

## VII

### Conclusion

For the foregoing reasons the defendant's appeal is hereby denied and dismissed. We affirm the judgment of conviction entered in the Superior Court. The papers in the case may be remanded to Superior Court.