STATE

v.

**Sory KABA et al.**

No. 99–113–C.A.

Supreme Court of Rhode Island.

June 3, 2002.

Jane McSoley, Aaron L. Weisman, Providence, for Plaintiff.

Richard A. Ciccone, Paula Lynch Hardiman, Paula Rosin, Providence, for Defendant.

Present: WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

WILLIAMS, Chief Justice.

The defendants, Sory Kaba (Kaba) and Kankoumady Traore (Traore) (collectively referred to as defendants), appeal their three-count convictions, which include charges of possession and conspiracy to

possess heroin with the intent to deliver, after a Superior Court jury trial. The defendants argue that the trial justice committed a variety of errors during the trial.[1] We disagree and affirm the judgment of the Superior Court. The facts pertinent to this appeal are as follows.

## I

## Facts and Travel

This case concerns the delivery of a package from Thailand, addressed to 124 Imest Avenue in Pawtucket. On March 17, 1997, the package was intercepted at JFK International Airport in New York, and found to contain a large amount of heroin.[2] The parcel was then forwarded to Det. Peter Pasciucco (Det. Pasciucco), a Massachusetts Bay Transportation Authority (MBTA) police detective assigned to a "United States smuggling group" in Boston, Massachusetts.[3] Once Det. Pasciucco received the package, the heroin found in the bowl, which had been placed in a plastic bag, was retested.

A small amount of heroin was taken from the plastic bag and placed back inside the parcel, as a representative sample for a controlled delivery. The original contents of the package were replaced, except for the five bowls. A telephone book was added to compensate for the weight differential. The package was resealed, and on March 19, 1997, United States Customs Service Agent Robert O'Connell (Agent O'Connell) brought it to the Pawtucket Post Office (post office).

Detective Martin Briden (Det. Briden), of the Pawtucket Police Department's (police) special squad, testified that the address on the package was 124 Imest Avenue in Pawtucket. The addressee was Muaamed Traore. After checking the city directory, the police determined that Imest Avenue did not exist. Because of the similarity between the word "West" and "Imest," the police initially conducted an investigation of 124 West Avenue and subsequently learned that a vehicle parked in front of the premises was registered to Traore. Therefore, a decision was made to attempt the controlled delivery at 124 West Avenue, where Traore resided with Kaba. As part of the controlled delivery, a postal slip was left at defendants' apartment on March 20, 1997, notifying them that a package had arrived for them at the post office. The postal slip showed that the addressee's name was Muaamed Traore[4] and "Thailand" was written in the space for the sender's name.

---

1. Although Traore fully briefed only one issue on appeal, he has adopted the arguments offered by Kaba without comment. We have previously held that this practice is permissible. *See State v. Oliveira,* 774 A.2d 893, 904 n. 8 (R.I.2001).

2. At a pretrial motion to suppress hearing, it was revealed that the package was set aside by the United States Customs Service because it was sent from Thailand, a country listed by the United States Postal Service as a possible source of contraband. The parcel was X-rayed and shown to contain various kitchen utensils and five bowls. The decision was made to open the box, remove the five bowls, and subsequently break one of the bowls apart. It was discovered that the bowl had a false bottom that contained a white powdery substance that tested positive as heroin. This discovery initiated the investigation to find the addressee.

3. The transcript states that Det. Pasciucco is a detective with the "FBTA" police, this organization does not appear to exist. We assume, therefore, that Det. Pasciucco is an MBTA detective.

4. The postal slip actually reads "Muhamed Traere." However, a postal worker testified at trial that the name on the package itself reads "Muaamed." Therefore, we assume that the spelling utilized on the postal slip is erroneous.

On this same day, Det. Briden conducted surveillance at 124 West Avenue. At approximately 4 p.m., a vehicle registered to Traore drove up and parked. The occupant exited the car and went inside 124 West Avenue. Approximately five minutes later, an unregistered vehicle parked on the street and the occupants of that vehicle also went inside the apartment. Then at 4:10 p.m., defendants left their apartment, entered the unregistered vehicle, and drove away. Detective Briden followed the car. He testified that as Kaba drove, defendants made two stops before reaching their final destination, the post office. The defendants parked the unregistered vehicle in the social security building parking lot behind the post office. While defendants went into the post office, Det. Briden stayed in the parking lot.

Paul Izzo (Izzo), a post-office supervisor, testified that defendants came into the post office and gave a clerk the notice they received for the package. The clerk, in turn, notified Izzo that someone had inquired about the package. Izzo then confronted defendants and asked "[a]re you here to pick up the parcel from Thailand?" to which Kaba replied "[y]eah, Thailand." [5] Izzo then asked both men for identification. According to Izzo, the two looked at each other before handing over their identification. Traore stated that the parcel was for his brother in New York. Traore then signed a yellow slip for the package, Kaba collected the parcel, and both left the post office.

Detective Pasciucco testified that while conducting surveillance from across the street, he saw defendants emerge from the post office. He stated that Kaba, who was carrying the package, had it "over his head[,] almost like a weight lifter or barbell thing." Furthermore, Det. Pasciucco testified that defendants were "jovial" and appeared to be "joking" as they walked around the corner to the car.

When defendants reached the vehicle, Det. Briden testified, he saw Kaba place the package in the vehicle's rear compartment. After defendants were inside the vehicle, Det. Briden, along with several other officers, approached the vehicle, identified themselves as police officers, and arrested both defendants. During the arrest, Kaba asked Det. Briden if he was in trouble. Detective Briden answered that "he could be in big trouble." Kaba volunteered that "he had nothing to do with what was in the package." Detective Pasciucco further testified that after he followed defendants to the rear of the post office, the package was visible in the hatchback area of the car. Both the package and defendants were taken to the police station.

Approximately one week later, Agent O'Connell met with Det. Briden and handed over the five bowls that had been removed from the parcel. Detective Briden prepared the evidence and sent it to the state toxicology lab. The heroin removed from the five bowls and the small sample for the controlled delivery were analyzed. The toxicology report revealed that the sample weighed 3.34 grams and that the remaining heroin from the five bowls weighed 758.42 grams.

The defendants subsequently were charged with possession of heroin, conspiracy to possess heroin, and conspiracy to possess heroin with the intent to deliver. A Superior Court jury trial commenced. During trial, Det. Pasciucco testified to the value of the confiscated heroin. At that time, the heroin had a wholesale value of between $60,000 and $115,000. The street

**5.** Both defendants are natives of the country of Guinea and both are native speakers of the Mandingo language. Therefore, English is not their first language.

value of the heroin was between $1.5 million and $3 million.

At the close of the prosecution's case, each defendant moved for a judgment of acquittal. The trial justice denied both motions. The defendants rested without presenting any evidence and renewed their motions for judgment of acquittal. Again the trial justice denied the motions. During closing arguments, each defendant argued that the state failed to show that drug paraphernalia or other evidence of drug involvement was found at their residence or that they knew the contents of the package. The jury ultimately believed the state's case and returned a guilty verdict on all three counts for each defendant. Both defendants moved for a new trial. The trial justice denied the motions.[6]

The defendants were each sentenced to three years for possession of heroin. They were each sentenced to thirty years, with eight years to serve and twenty-two years suspended, for conspiracy to possess heroin. Both also were sentenced to thirty years, with eight to serve and twenty-two years suspended, for conspiracy to possess heroin with the intent to deliver. The sentences were to run concurrently. The defendants timely appealed.

## II

### The Motion to Suppress

■ Kaba argues that the trial justice erred in denying his motion to suppress his statements to Det. Briden. Detective Briden testified that Kaba asked if he was in trouble and later said that he "had nothing to do with what was in the pack-age."[7] Specifically, Kaba argues that the statements are inadmissible because they were involuntary and not made incident to a lawful arrest. Further, Kaba argues that the admission of the statements was unconstitutional because he had not been informed of his Miranda[8] rights before he made the statements. Both defendants also argue that the statements were extremely prejudicial and inadmissible pursuant to Rule 403 of the Rhode Island Rules of Evidence. We disagree.

■ This Court will not consider Kaba's argument that the statements are inadmissible because they were not made incident to a lawful arrest and because they were involuntary. This argument has been waived. "[A]llegations of error committed at trial are considered waived if they were not effectively raised at trial, despite their articulation at the appellate level." State v. Perry, 770 A.2d 882, 884 (R.I.2001) (quoting State v. Lyons, 725 A.2d 271, 273 (R.I.1999)). However, "an exception to the raise-or-waive rule [exists] when 'basic constitutional rights are concerned.' " State v. Breen, 767 A.2d 50, 57 (R.I.2001) (quoting State v. Mastracchio, 672 A.2d 438, 446 (R.I.1996)). In those cases, the "alleged error must be more than harmless, and the exception must implicate an issue of constitutional dimension derived from a novel rule of law that could not reasonably have been known to counsel at the time of trial." Id. (citing State v. Gomes, 690 A.2d 310, 319 (R.I.1997)). In the instant case, Kaba does not raise an issue derived from a novel rule of law. Furthermore, his argument concerns issues that reasonably

---

6. The record did not contain the judgment denying the motions for a new trial, but the trial justice's decision is evidenced by the transcript.

7. Traore adopts this argument in his brief but because he "lacks standing to raise any alleged violation of the codefendant['s] * * * constitutional rights," we do not address the merits of his claim. State v. Valenti, 772 A.2d 127, 130 (R.I.2001).

8. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

should have been known to counsel at the time of trial. Thus, Kaba's first argument has been waived.

Kaba next argues that the statements were inadmissible because at the time he made them, Det. Briden had not read him his *Miranda* rights. Kaba's use of *Miranda* is misplaced because "[t]he *Miranda* doctrine is not applicable to spontaneous statements but is triggered only by the dual presence of custody and interrogation." *State v. Walker,* 667 A.2d 1242, 1248 (R.I.1995). In the instant case, the statements were made absent police interrogation and voluntarily by Kaba after his arrest. The trial justice found that "not all arrests require the advisement of *Miranda,*" that the warning is necessary "only when the police intend to interrogate a suspect," and therefore, no warning was necessary under these circumstances. "We have long adhered to the view that findings made by a trial justice relating to the giving of *Miranda* admonitions and their sufficiency will not be set aside or disturbed on review unless clearly erroneous." *Id.* (citing *State v. Houde,* 596 A.2d 330, 335–36 (R.I.1991)). Because Kaba's statements were spontaneous and not the product of interrogation, we will not disturb the trial justice's finding.

Both defendants argue that the trial justice should have excluded the statements pursuant to Rule 403. We disagree. "Rule 403 may be invoked to exclude evidence that is prejudicial to defendant to the extent that the negative effect outweighs its probative value." *State v. Grundy,* 582 A.2d 1166, 1172 (R.I.1990). "The ultimate determination [under Rule 403] of the effect of * * * evidence is within the trial justice's discretion" and will not be disturbed unless "we find that the trial justice abused his discretion." *Breen,* 767 A.2d at 59 (quoting *State v. Marini,* 638 A.2d 507, 516 (R.I.1994)).

The record is devoid of any evidence that the trial justice abused his discretion by admitting the statements. The statements are relevant to determine defendants' knowledge of the contents of the package. Thus, we deny defendants' Rule 403 claim.

## III

### Voir Dire

Kaba argues that the trial justice improperly restricted his attorney's inquiry of potential jurors during *voir dire.* We disagree.

Rule 24(a) of the Superior Court Rules of Criminal Procedure governs the examination of potential jurors. Rule 24(a) provides that:

"The Court may permit a defendant or the defendant's attorney and the attorney for the State to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event, the court shall permit the defendant or the defendant's attorney and the attorney for the State to supplement the examination by further inquiry or, upon request, shall itself put to the prospective jurors such additional questions as are submitted by the parties or their attorneys. The examination of prospective jurors shall be for the purpose of determining whether a prospective juror is related to a party, or has any interest in the case, or has expressed or formed an opinion or is sensible of any bias or prejudice therein. The examination shall be conducted under oath if requested."

"Although the trial justice may not hinder the attorneys' attempts to inquire into the objectivity of the prospective jurors, the scope of examination of prospective jurors during *voir dire* is within the sound discretion of the trial justice." *State v. Goodreau,* 560 A.2d 318, 323 (R.I.1989) (citing

*State v. Taylor,* 423 A.2d 1174 (R.I.1980)). (Emphasis added.) In the instant case, Kaba points to various examples of how the trial justice improperly limited the scope of *voir dire.* However, none of them rise to the level of reversible error. For example, we have held that failure to "permit any inquiry concerning racial prejudice [runs] afoul of the explicit language of Rule 24(a) which permits such questioning" and is grounds for reversal. *Taylor,* 423 A.2d at 1176. In the instant case, none of the objections Kaba makes concerns racial prejudice. In addition, the trial justice properly instructed the jury on the presumption of innocence, which was furthered by the wide latitude defendants' attorneys were afforded in questioning the potential jurors about possible bias or prejudice.

█ Finally, we note that "[t]he exercise of [the trial justice's] discretion does not mean that [the trial justice] must permit every question * * * that can be devised by an ingenious attorney." *State v. Spivey,* 114 R.I. 43, 48, 328 A.2d 414, 417 (1974). The record reflects that the purpose of *voir dire* was adequately fulfilled. As such, the trial justice did not abuse his discretion.

## IV

### Legal Sufficiency of the Evidence

The defendants argue that the evidence presented was legally insufficient to prove beyond a reasonable doubt that defendants knew the package contained a controlled substance. As such, defendants argue that the trial justice committed two errors by denying both the motions for judgment of acquittal and the motion for a new trial. We disagree, and examine first the motion for a new trial.

### Motion for a New Trial

█ The standard of review applied in evaluating a motion for new trial is well established. *See State v. Otero,* 788 A.2d 469, 472 (R.I.2002). "In deciding a motion for a new trial, the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *Id.* (quoting *State v. Banach,* 648 A.2d 1363, 1367 (R.I.1994)). The motion for a new trial should be denied "[i]f, after conducting this independent review, the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome." *Id.* (citing *Marini,* 638 A.2d at 515–16 and *State v. Clark,* 603 A.2d 1094, 1096 (R.I.1992)).

█ When ruling upon this motion, the trial justice does not need to refer to all the evidence supporting the decision but "need only cite evidence sufficient to allow this [C]ourt to discern whether the justice has applied the appropriate standards." *Otero,* 788 A.2d at 472 (quoting *Banach,* 648 A.2d at 1367). If the trial justice has complied with this procedure, his decision will be accorded great weight, and will not be disturbed unless the trial justice has overlooked or misconceived material evidence or was otherwise clearly wrong. *See State v. Golembewski,* 791 A.2d 468, 470 (R.I.2002) (citing *State v. Luanglath,* 749 A.2d 1, 4 (R.I.2000)).

In the instant case, the record demonstrates that the trial justice accurately and adequately performed the requisite review and did so carefully and with sufficient reasoning for denying the motion. Although the trial justice did not specifically review the testimony of each witness, he noted that the testimony was uncontested and, in his evaluation of the evidence, found the testimony to be credible. The trial justice reviewed the evidence, including the fact that the package was sent

from Thailand and was seized at JFK airport in New York, and that concealed within the five bowls was a significant amount of heroin with a street value ranging from $1.5 million to $3 million.

Next, the trial justice examined the law on possession of a controlled substance as relayed to the jury in his instructions, which requires "proof of a conscious possession of the contraband, and an intentional control of a designated object with knowledge of its nature." Furthermore, he stated that "[i]t could be shown by evidence of acts, declarations or conduct of the accused from which an inference may be fairly drawn that defendant knew of the existence of narcotics at the place they were found." The trial justice also noted that "[k]nowing or intentional possession of contraband cannot be inferred merely from the fact of delivery to defendants by mail of a sealed package containing contraband, and that acceptance of the package by itself cannot yield an inference of knowledge by the recipient of its contents. Something more by way of intended circumstances must be shown" to prove that defendants knew what was in the package and intended control.

Furthermore, the trial justice examined the evidence of defendants' response to Izzo when receiving the package that Kaba was "waiting for a package from Thailand" and Traore exclaimed "the package is for my brother in New York." The trial justice went on to discuss Kaba's post-arrest statement asking if he was in trouble, and stated that it "would suggest or would cause a reasonable juror to infer that * * * [Kaba made the statement] because of having in his hands and placing in the trunk the heroin received from New York." In addition, the trial justice discussed the fact that Kaba was "flipping [the package] over his head" as he left the post office and stated that "I think a rea-sonable person can infer that one had to know what was in that package" because Kaba's actions ran the risk of damaging the package's contents, possibly something of great value. Finally, the trial justice stated that:

> "the amount [ ] [of heroin], the manner in which the defendants acted, would allow and did allow twelve jurors to unanimously agree they felt the State more than satisfied its burden in proving beyond a reasonable doubt that the defendants possessed that is they knew what was in the package and they intended to exercise control and dominion over that package."

The trial justice denied defendants' motion for a new trial.

Having concluded that the trial justice properly performed the requisite review, we next consider whether the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong. *Otero*, 788 A.2d at 472 (citing *State v. Bleau*, 668 A.2d 642, 646 (R.I.1995)). The defendants maintain that the facts relied upon by the trial justice were insufficient to prove beyond a reasonable doubt that they knew of the package's contents. Furthermore, defendants argue that the state failed to carry its burden because it relied on a "pyramid of inferences" which were not the only inferences to be drawn. The defendants rely on a number of cases from other jurisdictions to persuade this Court. We reject this argument.

 In the instant case, we are satisfied that sufficient evidence was introduced to support a finding that defendants had knowledge of the package's contents. "In Rhode Island possession within the context of a criminal statute means an intentional control of an object with knowledge of its nature." *State v. Colbert*, 549 A.2d 1021, 1023 (R.I.1988) (citing *State v. Jenison*, 442 A.2d 866, 875 (R.I.1982) and

*State v. Gilman,* 110 R.I. 207, 215, 291 A.2d 425, 430 (1972)). "Knowledge of the nature of the object must necessarily precede the exercise of such control." *Id.* at 1023–24 (citing *Gilman,* 110 R.I. at 215, 291 A.2d at 430). "Proof of the knowledge of the object, which is essential to conviction, may be shown by evidence of acts, declarations, or conduct of the accused from which an inference may be drawn that he or she knew of the existence of narcotics at the place where they were found." *Id.* at 1024. Furthermore, we note that "the mere fact that the consignee takes possession of the container would not alone establish guilt of illegal possession or importation of contraband." *Illinois v. Andreas,* 463 U.S. 765, 769 n. 3, 103 S.Ct. 3319, 3323 n. 3, 77 L.Ed.2d 1003, 1009 n. 3 (1983).

■ The record contains sufficient evidence from which a jury could infer that defendants knew the package contained heroin. A postal slip was left at defendants' residence on March 20, 1997, notifying them that a package was available for them at the post office, and that the sender was "Thailand." Detective Briden testified that he witnessed a vehicle registered to Traore stop at 124 West Avenue. Detective Briden then saw both defendants leave their residence and get into an unregistered vehicle and drive to the post office. Izzo testified that defendants entered the post office to claim the package. Izzo approached the two and asked whether they were at the post office to pick up the package from Thailand, to which Kaba replied, "[y]eah, Thailand." Traore also stated that the "parcel was for his brother" and that "he was in New York." After producing identification, Traore signed the slip releasing the package, and both left, with Kaba carrying the parcel.

While conducting surveillance across the street, Det. Pasciucco testified that the two were "jovial" as they left the building, and that Kaba was hoisting the package "over his head," similar to a weightlifter and signifying victory. As Kaba was being arrested, he asked whether he was in trouble, to which Det. Briden replied that he was in big trouble. Kaba then asserted that "he had nothing to do with what was in the package." Relying upon reasonable inferences that can be drawn from the evidence we have just summarized, we are convinced that a jury could find beyond a reasonable doubt that defendants were fully aware that the package contained heroin.

■ On the issue of control, the evidence is equally strong. Again, both defendants arrived at the post office to claim the package. After Traore signed for the package, Kaba carried it from the post office to the vehicle. Upon returning to the vehicle, Kaba placed the package in the rear of the car and both men entered the vehicle. These facts indicate that both men exerted dominion and control over the package. Thus, we are convinced that a jury could find beyond a reasonable doubt that the two possessed the heroin.

The circumstantial chain of evidence in this case discloses that the number of the street address matches the defendants' address; the name of the street was off by one letter; an individual named Traore lived at the West Street address and was observed operating a motor vehicle registered to an individual named Traore. Thus, from the nearly correct street address, the identical last name of the addressee of the package, the use of an unregistered vehicle by both defendants to pick up the package, and the subsequent behavior of defendants, a jury could reasonably find that defendants were expecting the contraband and exercised dominion and control over the package sufficient to

establish possession with actual knowledge of its contents.

The defendants argue also that the trial justice's consideration of the evidence was clearly wrong since there are alternative explanations for defendants' behavior that are inconsistent with guilt. We disagree.

■ This Court has stated that:

"The pivotal question in determining whether circumstantial evidence is sufficient to prove guilt beyond a reasonable doubt is whether the evidence in its entirety constitutes proof beyond a reasonable doubt or is of such a nature that it merely raises a suspicion or conjecture of guilt. Under this test, it is possible for the state to prove guilt by a process of logical deduction, reasoning from an established circumstantial fact through a series of inferences to the ultimate conclusion of guilt. The pyramiding of inferences during this process of deduction becomes speculative, however, and thus insufficient to prove guilt beyond a reasonable doubt when the initial inference in the pyramid rests upon an ambiguous fact that is equally capable of supporting other reasonable inferences clearly inconsistent with guilt." *State v. Caruolo*, 524 A.2d 575, 581–82 (R.I.1987) (citing *State v. Alexander*, 471 A.2d 216, 218 (R.I.1984) and *In re Derek*, 448 A.2d 765, 768 (R.I. 1982)).

In the instant case, defendants argue the trial justice committed error because their conduct after their arrest could be attributed to bewilderment instead of an awareness of guilt. Furthermore, defendants contend that Kaba would not have lifted the package over his head if he knew it contained heroin because the behavior increases the possibility of dropping the package and having it inadvertently open in the street. However, we do not agree that defendants have demonstrated that the facts are ambiguous enough to be equally capable of supporting inferences clearly inconsistent with guilt. "[T]he state is not required to disprove every reasonable hypothesis of innocence as long as the totality of circumstantial evidence offered constitutes proof beyond a reasonable doubt." *Caruolo*, 524 A.2d at 582. Thus, the trial justice did not err.

Moreover, defendants argue that the trial justice was clearly wrong because Kaba's response to Izzo that he was waiting for a package from Thailand does not demonstrate a positive act or declaration evidencing knowledge of the package's contents since English is not his first language. The defendants also contend that the trial justice failed to consider the fact that no drug paraphernalia was found on their person and no evidence was found in their home to connect defendants with narcotics distribution. We hold that these claims are without merit. As stated, the trial justice does not need to cite to all the evidence in his determination of a motion for a new trial. The trial justice must discuss only enough for this Court to discern whether he applied the appropriate standard. *See Otero*, 788 A.2d at 472 (citing *Banach*, 648 A.2d at 1367). Thus, for the reasons stated, we will not disturb the trial justice's ruling.

**Motion for Judgment of Acquittal**

■ The defendants' argument that the trial justice erred in denying their motion for judgment of acquittal is similarly without merit. "In reviewing a claim of legal sufficiency of the evidence in the context of a motion for a judgment of acquittal, this Court applies the same standard as that applied by the trial court, namely, '[we] must view the evidence in the light most favorable to the state, * * * giving full credibility to the state's witnesses, and draw therefrom all reasonable

inferences consistent with guilt.'" *Otero*, 788 A.2d at 475 (quoting *State v. Snow*, 670 A.2d 239, 243 (R.I.1996)). However, "[t]he standard applied to a motion for judgment of acquittal requires less in the way of evidence than the standard applicable to a motion for a new trial." *Id.* (quoting *State v. Salvatore*, 763 A.2d 985, 989 (R.I.2001)). Thus, having concluded that the evidence in this case was sufficient to withstand "the more stringent review applicable to a motion for a new trial, it follows that the evidence was also sufficient to withstand a motion for a judgment of acquittal." *Id.*

## Conclusion

The defendants' appeal is denied and dismissed. The judgment of the Superior Court is affirmed. The papers of the case may be returned to the Superior Court.

FLANDERS, J., dissenting.

Responding to a notice that the authorities had prepared and delivered to their home, the defendants, Sory Kaba (Kaba) and Kankoumady Traore (Traore),[9] drove to the post office and accepted delivery of a sealed package from Thailand. Before they did so, however, customs officials alerted the police that the package contained a substantial quantity of heroin. For reasons that the record does not disclose, the authorities delivered notification slips concerning the package to the address where defendants lived, even though the name and the address written on the package differed from the defendants' names and address. Moments after the defendants picked up the package at the post office, but before they could open it, the police swooped down on them and took them into custody.

The defendants are before us on appeal from their Superior Court convictions for possession of a controlled substance, conspiracy to possess a controlled substance, and conspiracy to possess a controlled substance with intent to distribute. They argue that we should vacate their convictions because the state lacked legally sufficient evidence upon which to convict them of these crimes. According to the state's evidence, they suggest, they simply responded to a notice that the authorities had prepared and delivered to them at their residence, pursuant to which they proceeded to the post office and picked up a sealed package that, unbeknownst to them, contained heroin. Therefore, they posit, the trial justice erred when he refused to grant their motions for judgments of acquittal pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure.[10] The state, on the other hand, contends that it presented legally sufficient evidence to support defendants' convictions, and, therefore, that the trial justice did not err in his denial of their acquittal motions.

Because I am of the opinion that insufficient evidence existed to establish beyond a reasonable doubt that defendants knew that the sealed package they had picked up at the post office contained contraband, I conclude that the trial justice erred when he refused to grant defendants' motions for judgments of acquittal. As a result, I would vacate the convictions and remand the papers in this case to the Superior

---

**9.** Both defendants immigrated to this country from the West African nation of Guinea. Because their native language was Mandingo, interpreters assisted both defendants at trial.

**10.** Kaba also asserts that the trial justice erred by restricting his *voir dire* of potential jurors, refusing to suppress certain statements he made to the police, and failing to grant his motion for a new trial. Because I would hold that the state failed to present legally sufficient evidence to convict defendants of these crimes, I would not reach these other alleged errors.

Court for entry of judgments of acquittal for both defendants.

## Facts and Travel

On March 17, 1997, agents of the United States Customs Service intercepted a large sealed package that entered the country via Kennedy Airport in New York City. Although the agents were unable to discern the sender's name or address from the writing on the package, they were able to read the sender's country of origin as "Thailand." The unknown sender addressed the package to one "Muaamed Traore, 124 Imest Ave., Pawtucket Rhode Island." Suspicious of the contents, the customs agents opened the package and found five bowls inside, together with various kitchen utensils. They then proceeded to break open one of the bowls and discovered, hidden within a false bottom, 188 grams of a substance that later tested positive as heroin. The agents then resealed the contents and delivered it to their counterparts in Boston, Massachusetts.

Customs agents in Boston removed the remaining four bowls and sent them to the state toxicology laboratory for examination. After the laboratory confirmed the presence of large amounts of heroin in all the bowls, the police estimated the street value of the concealed contraband at $1.5 million to $3 million. The agents placed a smaller amount of the heroin back in the container. They also added several telephone books to compensate for the difference in weight, resealed the contents, and brought the package to the Pawtucket Police Department for it to arrange a controlled delivery of the package to the addressee.

Upon further investigation, however, the police were unable to locate an Imest Avenue in Pawtucket. And the record reveals no attempt to locate the addressee, one Muaamed Traore. Instead, the authorities decided—for reasons not revealed by the state's evidence—to attempt a controlled delivery of the contraband-containing package to a different address and to a different addressee than the ones that appeared on the original package. To do so, the authorities prepared a notification slip concerning the package and arranged for the notice to be delivered to the residential premises located at 124 West Avenue,[11] where defendant Kankoumady Traore lived on the third floor as a tenant with defendant Sory Kaba. On March 19, 1997, a postal inspector delivered a notification slip to 124 West Avenue, which indicated that the local post office was holding a package from Thailand addressed to a "Muhamed Traore." On that portion of the notification slip showing the sender's name, the authorities identified the sender as "Thailand." Although the police actively surveilled 124 West Avenue that day, no one residing there attempted to retrieve the package from the post office. Accordingly, on the next day, March 20, 1997, the police delivered to the premises a second notification slip they had prepared with the same inserted information.

11. The record does not reveal exactly why the police chose to deliver the notices about the package to 124 West Avenue. In particular, the state offered no evidence indicating that the authorities believed that the handwritten address on the package spelling out "Imest" could have been intended to be written as "West." Apparently, the police had conducted some previous surveillance at 124 West Avenue before the March 20, 1997 delivery date, but the record does not disclose why the police were surveilling that address, or why they decided to deliver notices about the suspect package to that location, except that one of the investigating officers testified that "there is no Imest Avenue in the City of Pawtucket and West Avenue comes to my mind immediately, and that's where the investigation started."

Thereafter, at approximately 4:10 p.m. on that same date, the police observed two men—later identified as Kaba and Traore—exit the 124 West Avenue premises and drive away in a Hyundai automobile. The men then tended to various errands (visiting a temporary employment agency and a bank) before wending their way to the Pawtucket post office. There, numerous police officers and government agents were hiding in wait for them. Upon entering the post office, one of the defendants[12] handed the "Thailand" claim slip for the package to a postal employee, who in turn notified his supervisor that a man was attempting to claim the suspect package. The supervisor, Paul Izzo (Izzo), asked whether defendants were there to retrieve the package from Thailand, to which Kaba replied "Yeah. Thailand." Izzo informed the men that he needed to see some identification, which they produced. Traore then signed for the package, telling Izzo that the package was for his brother in New York. Officer Pasciucco, a policeman assigned to the customs task force, watched as defendants exited the post office, saw them speaking with each other in what he categorized as a "jovial" manner, and observed that Kaba at one point lifted the package over his head, moving it up and then down as he headed out the door. The surveillance team observed defendants approach the parked Hyundai and watched them as Traore entered the front passenger side of the car, while Kaba placed the package in the trunk. Eight or ten agents and police officers then converged on the car, surrounded defendants, and placed them under arrest. After his arrest, but before the police gave him the *Miranda* warnings,[13] Kaba allegedly asked Pawtucket Po-

lice Detective Briden whether he was in trouble. The detective told him that he could be in big trouble, to which Kaba allegedly responded that "he had nothing to do with what was in the package."

The case proceeded to a jury trial in Providence County Superior Court. At the close of the state's evidence, defense counsel for both men moved for judgments of acquittal on the ground that the state's evidence, as recited above, was legally insufficient to support a verdict of guilt beyond a reasonable doubt. The trial justice denied that motion, stating:

"[a] case can be supported by circumstantial evidence, whether or not there's reasonable inferences that can be drawn to infer guilty knowledge. Here we cannot underestimate * * * the amount at issue. If the testimony of the agent is believed, the package contained approximately 1.5 to 3 million dollars worth of heroin * * * the amount of heroin in the package and his estimate as to the street value, certainly is a significant factor in determining whether or not a person knew he is charged with possession. It would be unreasonable to infer that any person would send in the mail 1.5 to 3 million dollars worth of heroin without having recognized the receiver knew what was in the package. * * * We have the testimony of the post office employee, when he indicated that when the defendants retrieved the package Kaba said, 'Yes, from Thailand,' obviously conveying some belief that he was expecting a package from Thailand. There's no testimony offered as to what he believed that package to contain. The codefendant, Traore, testified according to Izzo that, 'Yes, the package is for my brother in New York.' Again, a

---

**12.** It is unclear from the record which one of the defendants presented the notification slip to the postal employee.

**13.** *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

recognition there was something in the package. They were expecting a package from Thailand. The manner in which the package was carried out, as suggested by the State's witnesses, would certainly not suggest they were expecting to receive glassware. [The evidence] would allow a reasonable person to conclude if they found the evidence to be proven, that the person in possession knew what was in the box." [14]

Immediately after the trial justice heard and denied their motions for judgment of acquittal, both defendants rested without presenting any evidence. Their convictions and these appeals soon followed.

## Analysis

The standard to be applied in ruling on a motion for judgment of acquittal is as follows:

"In considering a motion for judgment of acquittal, a trial justice must review the evidence in the light most favorable to the state, without weighing the evidence or assessing the credibility of the witnesses, in fact giving full credibility to the state's witnesses, and draw therefrom all reasonable inferences consistent with guilt. *State v. Mercado,* 635 A.2d 260, 263 (R.I.1993); *State v. Laperche,* 617 A.2d 1371, 1373 (R.I.1992). If the

totality of the evidence so viewed and the inferences so drawn would justify a reasonable juror in finding a defendant guilty beyond a reasonable doubt, the motion for a judgment of acquittal must be denied. *Laperche,* 617 A.2d at 1373; *State v. Grundy,* 582 A.2d 1166, 1170 (R.I.1990); *State v. Caruolo,* 524 A.2d 575, 581–82 (R.I.1987). In reviewing a trial justice's denial of such a motion, this Court applies the same standard as the tribunal below. *Mercado,* 635 A.2d at 263." *State v. Snow,* 670 A.2d 239, 243 (R.I.1996).

Because the state charged defendants with possession of a controlled substance, the law required it to prove two elements beyond a reasonable doubt.

"In Rhode Island possession within the context of a criminal statute means an intentional control of an object with knowledge of its nature. *State v. Jenison,* 442 A.2d 866, 875 (R.I.1982); *State v. Gilman,* 110 R.I. 207, 215, 291 A.2d 425, 430 (1972). Knowledge of the nature of the object must necessarily precede the exercise of such control. *State v. Gilman,* 110 R.I. at 215, 291 A.2d at 430. Proof of the knowledge of the object, which is essential to conviction, may be shown by evidence of acts, declara-

14. The trial justice also relied on this Court's decision in *State v. Sundel,* 121 R.I. 638, 402 A.2d 585 (1979). But that case dealt with a different situation than this one, and did not touch at all upon controlled deliveries. The defendant in *Sundel* admitted possessing a small amount of narcotics that the police found in his home, but he denied possessing a much larger quantity also found there. Citing *State v. Gilman,* 110 R.I. 207, 291 A.2d 425 (1972), this Court stated that "possession of a proscribed substance can give rise to the inference that the possessor knows what he possesses, especially if it is in his hands, on his person, in his vehicle, or on his premises." *Sundel,* 121 R.I. at 645, 402 A.2d at 589. In my opinion, however, the *Sundel* holding is limited to situations in which, for example, a defendant acknowledges possessing several pills, or a green vegetable matter, on his person, in his home, or in his vehicle, but then denies knowing the nature of these substances (that is, illegal drugs) or about further quantities of the same substances found elsewhere but in the same general area. In such a case, a permissible inference arises that the defendant has knowledge of the nature of the substance in question. The *Sundel* case, therefore, does not aid our analysis of a controlled-delivery situation, such as the one in this case, where no evidence directly established defendants' knowledge of the nature of what they picked up at the post office.

tions, or conduct of the accused from which an inference may be drawn that he or she knew of the existence of narcotics at the place where they were found." *State v. Colbert*, 549 A.2d 1021, 1023–24 (R.I.1988).

The defendants do not dispute that they exercised intentional control over the package; rather, they dispute the sufficiency of the state's evidence to show that they knew that the package contained contraband before or, for that matter, at any time after they exercised control over it. If the state failed to prove this latter element of the crime beyond a reasonable doubt, then defendants were entitled to an acquittal. *State v. Mora*, 618 A.2d 1275, 1280 (R.I.1993) (holding that "[w]hen the state prosecutes a defendant, it carries the burden of proving every element necessary to the charge beyond a reasonable doubt * * * "). Moreover, if the state did not prove beyond a reasonable doubt that defendants knowingly possessed the controlled substance, then necessarily the state did not prove beyond a reasonable doubt the conspiracy and possession-with-intent-to-distribute charges.

Because direct evidence rarely exists to prove a defendant's knowledge of the nature of an object he or she constructively possesses, the state may prove such knowledge through the use of circumstantial evidence. *Mora*, 618 A.2d at 1280. Thus, it is well established that "[t]hrough a process of logical deduction, the state may prove guilt from an established circumstantial fact through a series of inferences." *State v. Dame*, 560 A.2d 330, 334 (R.I.1989) (citing *State v. Caruolo*, 524 A.2d 575, 581–82 (R.I.1987)). Nevertheless,

"[i]f this pyramiding of inferences becomes speculative * * * proof of guilt beyond a reasonable doubt will not be found. * * * *State v. Alexander*, 471

A.2d 216, 218 (R.I.1984); *In re Derek*, 448 A.2d 765, 768 (R.I.1982). We have recognized that pyramiding of inferences becomes speculative when the initial inference rests upon an ambiguous fact that may support other inferences which are clearly inconsistent with guilt. [*Caruolo*], 524 A.2d at 582." *Dame*, 560 A.2d at 334.

Here, our task was to determine whether the circumstantial evidence in question amounted to a pyramid of inferences too speculative to support a finding of guilt beyond a reasonable doubt that defendants knew what was inside the package before they picked it up at the post office.

Both defendants and the state have brought to our attention numerous cases from other jurisdictions dealing with controlled deliveries of narcotics, such as the one at issue in this case. Uniformly, those jurisdictions have held that the "knowing or intentional possession [of contraband] cannot be inferred merely from the fact of delivery to defendant by mail or common carrier of a sealed package containing the illegal goods, and that acceptance of the package by itself cannot yield an inference of knowledge by the recipient of its contents." *State v. Richards*, 155 N.J.Super. 106, 382 A.2d 407, 411 (1978). *See also Illinois v. Andreas*, 463 U.S. 765, 769 n. 3, 103 S.Ct. 3319, 3323 n. 3, 77 L.Ed.2d 1003, 1009 n. 3 (1983) ("the mere fact that the consignee takes possession of the container would not alone establish guilt of illegal possession or importation of contraband"); *United States v. Samad*, 754 F.2d 1091, 1096 (4th Cir.1984) (holding that the state cannot establish criminal liability for possession by "merely [showing] that a package contain[ing] drugs was mailed from outside this country and was received and opened by the addressee of the package who resided in this country"); *State v. Gomez*, 126 Idaho 700, 889 P.2d 729, 736

(1994) (concurring with the view that a defendant's mere receipt of a sealed package containing contraband is insufficient to support his or her conviction for knowing or intentional possession of that contraband); *Commonwealth v. Aguiar*, 370 Mass. 490, 350 N.E.2d 436, 442 (1976) (holding that, without more, possession of an unopened package containing drugs, which the defendant received through the mail moments before his arrest, cannot support an inference of knowing possession beyond a reasonable doubt). The trial justice, however, ignored this general rule and instead created his own exception for cases like this one in which the accused takes possession through the mail of a sealed package containing a large amount of contraband with a high "street value." In linking the large quantity and high "street value" of the concealed drugs to the recipients' presumed knowledge of same, the trial justice, I believe, erred as a matter of law, especially when he concluded that "[i]t would be unreasonable to infer that any person would send in the mail 1.5 to 3 million dollars worth of heroin without having recognized the receiver knew what was in the package." But this reasoning overlooks the possibility that defendants were not the intended recipients of the package. The trial justice's analysis assumes—erroneously, in my opinion—that the actual receiver will always be the same person as the intended receiver, when in fact they may not be the same because of a mistake or, as here, because of an intentional diversion of the package to someone other than the addressee. And what about individuals, such as Kaba, who merely accompany the actual recipient to the place of delivery and assist in taking control of the package? Here, presumably the intended recipient was the addressee, one "Muaamed Traore." The actual recipient, however, was Kankoumady Traore. For all we can know and infer from the record,

these were two different people. And no evidence suggested that Kaba knew about the contents of the package merely because he accompanied his roommate to the post office and helped him to carry it to their car.

Thus, far from constituting "a significant factor in determining whether or not a person [who receives such a package] knew he is charged with possession," the "street value" of the contraband in the package should have been irrelevant in deciding whether the recipients knew about what was inside the package before they accepted the delivery. Otherwise, a person's knowing or intentional possession of contraband could be inferred merely from the fact of delivery to the person of a sealed package containing such contraband. And anyone who accompanied the recipient and assisted him or her in taking delivery also would be subject to such an unjustified inference. I believe that the trial justice committed a fundamental error in equating the large amount and high street value of the hidden contraband with the recipients' purported knowledge of its presence inside the package, and that this error infected all the trial justice's reasoning about what defendants must have known about the existence of contraband in the package.

Although this Court has not specifically ruled on this precise issue in its previous cases, I agree with the above-cited authorities from other jurisdictions, which hold that merely taking possession of a sealed package containing contraband—delivered to a person through the mail or by other legitimate means—cannot, without more, subject that person to criminal liability, even though the amount and value of the contraband inside the package proves to be substantial. The inherent risk in holding otherwise would place innocent people in criminal jeopardy for the unilateral and

unsolicited acts of third parties, including not only their deliberate acts, but also their mistakes and those of others in the delivery chain who cause packages to be delivered to persons who are not the ultimate intended recipients. Because defendants' mere possession of the sealed package could not subject them to criminal liability, the law required the state to demonstrate—at least inferentially—that defendants knew that the package contained contraband before they took possession and control of it at the post office. Therefore, the issue squarely presented for this Court's consideration was whether the circumstances surrounding the delivery of the package in this case, and the reasonable inferences to be drawn therefrom, could support a finding that, beyond a reasonable doubt, defendants knew that the package contained a controlled substance before they took delivery of it at the post office, or whether it "is of such a nature that it merely raises a suspicion or conjecture of guilt." *State v. Caruolo,* 524 A.2d 575, 581 (R.I.1987).

The state argued that this case is factually similar to *Colbert.* There, the Court upheld the defendant's conviction for possession of marijuana with intent to deliver. *Colbert,* 549 A.2d at 1025. The defendant arrived at the T.F. Green Airport in Warwick to claim a barrel of personal goods that, he asserted, his mother-in-law had shipped to him via a bonded carrier. After executing the necessary claim forms with a customs agent, defendant identified the package as his, and began, at the customs agent's instruction, to remove the items from the barrel. The barrel contained nearly twenty pounds of marijuana. *Id.* at 1023. The Court found that the circumstances of the case—including the fact that defendant asserted that the sender was a relative and that the defendant had paid for the shipping charges—were sufficient to satisfy the knowledge element of the possession charge. Specifically, the Court stated that the defendant

> "admittedly spent over $60 to transport household goods from Jamaica to Providence that he admits had a value of less than $100. Again, upon its arrival at Green Airport, the barrel was only one-third full of household items and two-thirds full of marijuana. Surely if only the personal items were intended to be the cargo, a more cost-efficient container would have been used. * * * Evidence introduced at trial established that it was very uncommon for noncommercial shipments to be bonded because of the increased transportation costs * * * [and] Colbert was a bachelor." *Id.* at 1024.

Given these circumstances, the Court ruled that a reasonable jury could have found defendant guilty of possession of marijuana beyond a reasonable doubt.

Here, however, we are not presented with circumstances as in *Colbert,* in which the defendant asserted that he had arranged with a relative to send him a package whose delivery costs he paid for but whose legitimate contents were worth little more than the mailing or delivery costs. Indeed, in contrast to *Colbert,* no evidence suggested that these defendants had anything to do with arranging or paying for the delivery of the package. Nor is there any suggestion here that, as in *Colbert,* the defendants claimed that the sender of the contraband-containing package was a relative of one of them. If true, such a person could be expected to have arranged in advance with the recipient for the sending of the package and would quite naturally have been in regular communication with him (or his kin) concerning what she was sending. Moreover, it would make little economic sense for a person to arrange for the delivery of mere common household goods from out of the country when the

cost for doing so approximated the cost of the goods themselves.

I believe that this case is more akin to that of *Samad*. There, defendant Samad resided in an apartment with defendant Hanan. As in this case, both defendants were immigrants, and Samad at least experienced some difficulty with the English language, requiring a translator at his trial. *Samad,* 754 F.2d at 1094. The Drug Enforcement Agency (DEA) intercepted a package containing narcotics that was addressed to "M. Amin," with a delivery address at Hanan's and Samad's apartment. The DEA set up a controlled delivery of the package. Samad answered the door of the apartment and spoke to the letter carrier. The letter carrier asked for "M. Amin," to which Samad responded "Yes." Samad took the package and gave it to Hanan because the package listed Pakistan, Hanan's home country, as its country of origin. When Hanan opened the package, the narcotics fell out of it. Samad then left the room, having no further contact with the package. Before delivering the package, DEA agents had fitted it with a beeper to inform them when it was opened. Hanan's opening of the package triggered the beeper, and the agents then entered the apartment. Thereafter, a district court convicted Samad and Hanan of narcotics possession.

On appeal, the government asserted that Samad's "eager identification" of himself as the false addressee, inter alia, constituted sufficient evidence to support a finding of guilt beyond a reasonable doubt. The Fourth Circuit disagreed. It found that Samad's actions were entirely reasonable in light of the circumstances, especially given Samad's limited command of the English language. Moreover, all his actions, even when construed in the light most favorable to the government, were "simply too attenuated" to establish his guilt. *Sa-*

*mad,* 754 F.2d at 1098. I am convinced that this case presented similar circumstances to those in *Samad,* and that the inferences that the trial justice drew from these circumstances concerning defendants' knowledge of the package's illegal contents were much too attenuated to prove defendants' guilt beyond a reasonable doubt.

Here, the government's case against defendants rested on the slenderest of factual reeds. An unknown person in Thailand sent a package addressed to one "Muaamed Traore 124 Imest Ave. Pawtucket, Rhode Island." After the authorities concluded that no such address existed, they changed the address on the notification slip for the package to "124 West Ave." and caused it to be delivered there. Although defendant Kankoumady Traore shared the same surname as the addressee, no one by the addressee's name of "Muaamed Traore" lived at 124 West Avenue. Nevertheless, the police delivered not one, but two notification slips (listing the sender as "Thailand") to the 124 West Avenue address where defendants resided together with other tenants. Following the delivery of the second notification slip, defendants drove to the post office after running various other errands. Once there, they presented a postal employee with the notification slip. He then asked them if they were there to pick up the package from Thailand, and Kaba said "Yeah. Thailand." Traore informed the postal official that the package was for his brother in New York. The police then observed defendants exit the post office, while speaking "jovially" with each other. At one point, as defendants left the post office, they saw Kaba lift the package over his head. Moments later the police arrested both defendants, whereupon Kaba, quite understandably, asked whether he was in

trouble and disclaimed having anything to do with what was in the package.

In my opinion, none of these actions and statements—whether considered individually or collectively—were in any way incriminating because they were just as consistent with defendants' innocence as with their guilt. Thus, I believe that these facts, taken individually and as a whole, were legally insufficient to prove either defendant's guilt beyond a reasonable doubt because they did not suggest that, before they took delivery of the package, they must have known about the illegal nature of the contents.

The only way for these facts to amount to guilt beyond a reasonable doubt would be to engage in an impermissible pyramiding of speculation and adverse inferences upon a factual base incapable of proving beyond a reasonable doubt that defendants knew in advance that the package contained contraband—a process that this Court specifically condemned in *Dame*, 560 A.2d at 334. The name and address on the package and the large quantity of contraband secreted therein formed the base of this impermissible pyramid. The trial justice, however, overlooked the fact that the police had altered the original address shown on the package when they caused the notification slips to be prepared before delivering them to 124 West Avenue. He also overlooked the fact that neither defendant's name matched the addressee's name on the package. As a result, he further overlooked the distinct possibility that neither defendant was the intended recipient of this illicit package, while impermissibly inferring otherwise because of the large quantity and high "street value" of the narcotics secreted within.

I believe that the trial justice's reliance on the multimillion-dollar estimated street value of the narcotics involved was misplaced for two reasons. In denying defendants' motion for judgments of acquittal, the trial justice stated that anyone who would send such high-value illegal substances through the mail surely would have informed the intended recipient of at least the nature of the package's contents. But even were we to assume that this hypothesis was correct, the unknown sender in this case failed to address the package to the location where these defendants resided and failed to name either defendant correctly as the recipient of the package, thereby suggesting that neither defendant was the intended recipient. Indeed, but for the authorities' preparing and delivering notification slips to a different address and to a different addressee than the one specified on the package, in all likelihood these defendants never would have received any notice to pick up the package. The existence of this possibility—one that was at least as likely as the inferences drawn by the trial justice—demonstrates that the trial justice erred in placing such an emphasis on the quantity and street value of the narcotics hidden within the package. Although the quantity and value of narcotics seized in a controlled-delivery case may be quite significant in determining whether the recipient should be charged with possession with intent to distribute, the quantity or value of the contraband should never have been accorded such controlling significance in deciding whether the recipients were aware of the package's illicit contents before they took possession of it and before they could open it. Otherwise, simply by sending a significant quantity of valuable contraband to an innocent party—either by mistake or with the intent to incriminate the recipient—the sender, the intended recipient, or, as in this case, the authorities, thereby could unilaterally manufacture sufficient facts to convict an innocent recipient for illegal possession of a controlled substance.

In addition, the trial justice cited the alleged significance of defendant Kaba's affirmative response to the postal clerk's question of whether defendants were there at the post office to pick up the package from Thailand. But I can discern no inculpatory significance in that innocuous rejoinder. First, the postal inspector had mentioned when defendants first presented the claim slip to him that the package was from Thailand. Second, and most significantly, the notification slips that the authorities had prepared and delivered to 124 West Avenue proclaimed "Thailand" as the sender of the package. It was completely appropriate, therefore—and not at all suspicious or incriminating—for Kaba to respond "Yeah. Thailand" to Izzo's question whether he was there to pick up the package from Thailand. Either the postal authorities themselves, or information that the police had conveyed to defendants via the postal notification slips, were the likely source of this affirmative response from Kaba. And like the defendants in *Samad,* Kaba was also experiencing difficulty in speaking and understanding the English language. Traore's statement that the package was for his brother in New York, while perhaps raising some suspicion that he knew the person who was the intended recipient of the package, still did not create a beyond-a-reasonable-doubt inference concerning his knowledge of the package's illicit contents. Knowing and even expecting that a package is coming for a relative does not equate, in my judgment, with knowledge of the contents. For example, Traore's brother may have asked him to accept delivery of the package for him without telling him what was inside it or by misrepresenting that it contained fabrics, bamboo poles, or some other legitimate merchandise. Finally, the "jovial" interaction between Kaba and Traore after they received the package and the over-the-head manner in which

Kaba lifted it as he left the post office similarly raised no such inference of knowledge that the package contained contraband. There are simply too many other possible innocent explanations for this behavior for it to be capable of proving beyond a reasonable doubt defendants' consciousness of the contraband inside the package. Although, as the trial justice noted, "[t]he manner in which the package was carried out as suggested by the state's witnesses, would certainly not suggest they were expecting to receive glassware," the glassware versus contraband dichotomy hardly exhausted the possible contents of the package. Thus, even though we are bound to draw all inferences in favor of the state when passing on a motion for judgment of acquittal, I cannot say that the state presented sufficient evidence concerning whether defendants knew about the contraband in the package to support verdicts of guilt beyond a reasonable doubt on the possession charges.

Moreover, I cannot ignore, as the trial justice did, the conduct of the authorities in causing defendants to retrieve this package and in intentionally readdressing the notification slips for the package to a location and to an addressee that were different from the location and the addressee shown on the package. These circumstances leave me with reasonable doubts about whether defendants knew about the illegal contents of the package merely because they eventually picked it up at the post office in response to receiving the notices with the altered address that the authorities had prepared and delivered to them. To pyramid inferences of guilty knowledge concerning the illicit nature of the package based on such an extremely thin and flimsy factual base is in itself impermissible. *Caruolo,* 524 A.2d at 582 ("when the initial inference in the pyramid rests upon an ambiguous fact that is equal-

ly capable of supporting other reasonable inferences clearly inconsistent with guilt," the evidence is insufficient to prove guilt beyond a reasonable doubt). Most tellingly, however, all the inferences drawn concerning the intended addressee were tainted by the authorities' conduct in using a different address than the one on the package in connection with preparing and delivering the notices to an address and an addressee that were not shown on the package, and in communicating the package's country of origin to the recipients before they retrieved it. Moreover, even if the police had simply delivered the original package to defendants, the adverse inferences relied upon by the trial justice in denying defendants' motion—although certainly raising suspicions and possible inferences concerning defendants' potential guilt when viewed in the light most favorable to the state—cannot and do not rise to the beyond-a-reasonable-doubt level required to convict defendants for these crimes. *Dame*, 560 A.2d at 334 (holding that "*circumstantial evidence*, however, must be sufficient proof of guilt beyond a reasonable doubt and *will be found insufficient if it merely raises a suspicion or inference of guilt*," citing *Caruolo*, 524 A.2d at 581). (Emphases added.)

Although somewhat similar factually to the case at bar, the cases cited to us by the state all bear distinguishing factual features that are absent here. For example, in *State v. Arthun*, 274 Mont. 82, 906 P.2d 216 (1995), the defendant behaved in a most suspicious manner, hiding an unopened package containing narcotics in a farming shed some distance from his home. In this case, the police never gave defendants the opportunity to hide the un-

opened package or even to open it and thereby inform themselves of the nature of its contents. Moreover, defendants urge that the better course of action for the state to take in a controlled-delivery situation would be to await the defendants' opening of the package before the authorities move in to arrest the recipients. This suggestion, however, may not go far enough. A defendant in a controlled delivery case usually should have the opportunity not only to open the sealed package and appreciate the nature of the package's contents, but also he or she should be given the chance to exercise dominion and control over the illicit contents by taking some incriminating action with respect thereto before the authorities swoop in for the arrest.[15] *See United States v. Samad*, 754 F.2d 1091 (4th Cir. 1984) (holding that defendant Hanan, who attempted to hide drugs under a carpet that fell out from a package that he opened was guilty of possession, but not so with respect to codefendant Samad, whose actions did not suggest guilty knowledge of the contents under the circumstances); *United States v. Thao*, 712 F.2d 369 (8th Cir.1983) (controlled delivery case where the Eighth Circuit affirmed defendant's conviction because, when officers entered the house, the defendant had opened the package and hidden opium in various places).

The state also relies upon *Lockhart v. State*, 715 So.2d 895 (Ala.Crim.App.1997). There, the defendant became agitated when the post office could not deliver a package—one that she acknowledged she was "eagerly anticipating"—so she went to pick up the package herself. *Id.* at 897–

---

**15.** In some limited circumstances, such as those presented in *State v. Arthun*, 274 Mont. 82, 906 P.2d 216 (1995), in which the defendant drove the package, unopened, to a shed on his property and hid it there, the actual opening of the package may not be a prerequisite to an inference that the defendant possessed guilty knowledge of the unlawful nature of the contents.

98. In this case, however, a postal inspector delivered not one, but two notification slips to defendants concerning a package from Thailand that the authorities had taken upon themselves to readdress. Even then, it was not until after 4 p.m. on the day the postal authorities delivered the second notification slip that defendants actually headed to the post office to pick up the package. Moreover, they did not go straight to the post office, but took the time to stop at a temporary employment agency and a bank before finally arriving there. None of these circumstances suggest that defendants eagerly were anticipating the arrival of a shipment of $1.5 to $3 million worth of heroin. On the contrary, even viewed in the light most favorable to the state, these circumstances, and the inferences reasonably drawn therefrom, do not rise to proof beyond a reasonable doubt that defendants were aware of the contraband in the package. Consequently, the *Lockhart* case is not helpful on this point. The state, I conclude, failed to carry the heavy evidentiary burden that the law places on its shoulders in criminal prosecutions of this kind.

### Conclusion

As the sixteenth president of the United States once remarked, "[i]t is as much the duty of government to render prompt justice against itself in favor of citizens, as it is to administer the same between private individuals." [16] For the reasons stated above, I am of the opinion that the trial justice erred in this case when he refused to render prompt justice against the government by granting the defendants' motions for judgments of acquittal. I would therefore vacate the defendants' convictions and remand the papers in this case to Superior Court for entry of judgments of

acquittal. Because the state presented legally insufficient evidence to convict the defendants of possessing a controlled substance, I would also vacate their convictions for conspiracy and for possession of a controlled substance with intent to distribute.

---

16. Abraham Lincoln, First Annual Message to Congress, delivered December 3, 1861. *See* 5 *The Collected Works of Abraham Lincoln 1861–1862*, at 44 (Roy P. Basler ed.1953).